# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LEAF INVENERGY COMPANY, a
Cayman Islands exempt limited liability
company,

             Plaintiff,

      v.

INVENERGY WIND LLC, a Delaware
limited liability company,

             Defendant.

)
)
)
)
)
)
) C.A. No. 11830-VCL
)
)
)
)
)
)

## MEMORANDUM OPINION

Date Submitted: January 19, 2018
Date Decided: April 19, 2018

Bradley D. Sorrels, Shannon E. German, Jessica A. Hartwell, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Keith E. Eggleton, Steven D. Guggenheim, David A. McCarthy; WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Plaintiffs*.

Kenneth J. Nachbar, Kevin M. Coen, Zi-Xiang Shen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Bruce S. Sperling, Harvey J. Barnett, Eamon P. Kelly, SPERLING & SLATER, P.C., Chicago, Illinois; *Attorneys for Defendant*.

**LASTER, V.C.**

Leaf Invenergy Company ("Leaf") holds Series B member interests in Invenergy Wind LLC ("Invenergy" or the "Company"). Under Invenergy's limited liability company agreement (the "LLC Agreement"), Invenergy could not engage in an asset sale of a specified magnitude—defined as a "Material Partial Sale"—unless Invenergy either (i) obtained Leaf's consent or (ii) paid Leaf an amount sufficient for Leaf to achieve an agreed-upon rate of return—defined as the "Target Multiple."[1] This decision refers to the requirement that Invenergy obtain Leaf's consent as the "Series B Consent Right."

At the outset of the case, Leaf moved for judgment on the pleadings on the question of whether Invenergy had breached the Series B Consent Right by engaging in a Material Partial Sale without paying Leaf its Target Multiple. I granted Leaf's motion.

Leaf next moved for entry of a final judgment determining that the LLC Agreement entitled Leaf as a matter of law to damages in the amount of the Target Multiple. I denied the motion on the grounds that the LLC Agreement did not provide explicitly for the payment of the Target Multiple in the event of breach. The Series B Consent Right technically stated that if Invenergy paid Leaf the Target Multiple at closing, then Invenergy did not need to obtain Leaf's consent. The LLC Agreement did not include a liquidated damages provision or specify a remedy for breach of the Series B Consent Right. Consequently, I concluded that determining the proper remedy for Invenergy's breach

---

[1] The parties and their documents frequently abbreviate "Material Partial Sale" as "MPS" and Target Multiple as "TM."

1

required a trial. This post-trial decision holds that Invenergy's breach entitles Leaf only to nominal damages.

After Leaf filed this litigation, Invenergy exercised a right under the LLC Agreement to call Leaf's member interests. Leaf responded by exercising a parallel right to put its position to Invenergy. Disputes arose over that process, and Invenergy brought counterclaims asserting that Leaf violated the express terms of the put-call provisions as well as terms implied by the covenant of good faith and fair dealing. This decision finds that Invenergy failed to prove those claims. In light of this decision, the parties shall complete the buyout of Leaf's interests in accordance with the provisions in the LLC Agreement.

## I. FACTUAL BACKGROUND

Trial took place over three days. The parties submitted 536 exhibits and lodged fifteen depositions. Seven witnesses testified live. The parties proved the following facts by a preponderance of the evidence.

### A. Invenergy Solicits Interest In The Series B Notes.

Invenergy "develops, owns, and operates utility-scale wind generation facilities in North America and Europe."[2] Michael Polsky founded Invenergy in 2001 and has served

---

[2] PTO ¶ II.A.4. Citations in this format are to stipulated facts in the pre-trial order. Dkt. 160. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits using the JX-based page numbers generated for trial.

2

continuously since then as its President and CEO.[3] Polsky holds a majority of Invenergy's equity through two investment vehicles: Invenergy Wind Holdings LLC ("Invenergy Holdings") and Invenergy Wind Financing LLC ("Invenergy Financing").[4]

In summer 2008, Invenergy began soliciting interest in an offering of Series B convertible notes (the "Series B Notes"). In 2007, Invenergy had raised approximately $250 million through a similarly structured issuance of Series A convertible notes (the "Series A Notes"). Two third-party investors—Liberty Mutual Insurance Company ("Liberty") and Citigroup Global Markets, Inc. ("Citigroup")—purchased the bulk of the Series A Notes. Invenergy Financing invested alongside on the same terms and purchased approximately 10% of the issuance.[5]

When Invenergy proposed to issue the Series B Notes, Liberty expressed interest. So did Leaf Clean Energy Company, a publicly held investment company that specializes in the clean technology and renewable energy sectors.[6] Leaf Clean Energy would later form

---

[3] JX 17 at 4 (Invenergy private placement memorandum).

[4] *See* PTO ¶¶ II.B.1, 10-11, 13. The parties and their documents frequently abbreviate "Invenergy Wind Holdings" as "IWH" and "Invenergy Wind Financing" as "IWF."

[5] PTO ¶ II.B.3.

[6] *See* JX 13 at 14-15; Alemu Tr. 4-5, 7-8, 10.

Leaf to participate in the offering.[7] Polsky planned to have Invenergy Financing invest again alongside the third-party investors.

## B.    The Series B Term Sheet

In fall 2008, Invenergy sent a proposed term sheet to Liberty and Leaf.[8] One deal point, titled "Negative Covenants," contemplated that Invenergy would have to obtain approval from the holders of the Series B Notes (the "Series B Investors") before engaging in "a sale of all or substantially all of [the Company's] assets" or any "merger or acquisition of the Company."[9] The provision also contemplated that "approval will not be required in the event that such transaction would provide the [Series B Investors] the Target Multiple as of the applicable transaction date."[10]

Another deal point, titled "Merger, Sale, etc. of the Company," distinguished between "Control Transactions" and "Non-Control Transactions." The operative language on "Control Transactions" stated:

> In the case of a (i) merger, consolidation, sale or reorganization of the Company or a sale of equity in the Company as a result of which the current direct or indirect holders of the Company's equity securities immediately prior to such transaction will hold less than a majority of the Company's equity securities immediately following such transaction or (ii) sale of substantially all of the assets of the Company (a "Control Transaction")

---

[7] The distinction between Leaf and Leaf Clean Energy is not material to this decision. Except in rare instances, this decision refers solely to "Leaf."

[8] JX 20.

[9] *Id.* at 5.

[10] *Id.* at 5-6.

4

which occurs prior to the date which is the earlier of (a) the Conversion Deadline or (b) the date on which all of the Series B Notes have been converted . . . , any Series B Notes which are not converted in connection with the Control Transaction to which the Required Holders . . . have consented . . . shall be prepaid at par plus accrued but unpaid interest, with no penalty or premium.[11]

This proposal contemplated that a Control Transaction would extinguish the Series B Notes, either (i) through the Series B Investors converting and receiving their pro rata share of any distribution associated with the Control Transaction or (ii) as a result of the Company prepaying principal plus unpaid interest.

By contrast, for a Non-Control Transaction, the term sheet contemplated that Invenergy would have the option of extinguishing the Series B Notes. The Company would not be obligated to obtain consent before engaging in a Non-Control Transaction, nor would it be obligated to make any payment as a result of a Non-Control Transaction. Instead, Invenergy would have the option to redeem the Series B Notes for the Target Multiple. The operative language on "Non-Control Transactions" stated:

In the case of a (i) merger, consolidation, sale or reorganization of the Company or a sale of equity in the Company as a result of which the current direct or indirect holders of the Company's equity securities immediately prior to such transaction will continue to hold at least a majority of the Company's equity securities immediately following such transaction or (ii) sale of material assets of the Company that does not constitute a sale of substantially all of the assets of the Company (a "Non-Control Transaction") which occurs prior to the Conversion Termination Date, the Company may, at its option, offer to prepay all outstanding principal and interest on the Series B Notes, together with a premium in such amount that would result in receipt by the holders of the Target Multiple . . . . If such offer is made, each holder of Series B Notes shall have the option to (a) accept such offer, (b)

---

[11] *Id.* at 3-4.

5

decline such offer and convert its Series B Notes, following which the Company will be required to distribute to its members, pro rata, any proceeds from the Non-Control Transaction that are not required to be retained in the business of the Company pursuant to definitive documentation to be entered into in connection with this transaction.[12]

This proposal contemplated that upon the occurrence of a Non-Control Transaction—the type of transaction that the final agreement would define as a Material Partial Sale—Invenergy could choose whether to pay the Target Multiple to redeem the Series B Notes. Moreover, if Invenergy did elect to make such a payment and any Series B Investors did not accept, the holdouts would have to convert to equity. At that point, they would only receive their pro rata share of any proceeds from the Non-Control Transaction distributed to the equity holders.

These concepts ran counter to the definitive agreement governing the Series A Notes (the "Series A Agreement"). The Series A Agreement required Invenergy to obtain approval from the holders of the Series A Notes both for (i) a "Liquidity Event," unless the transaction "would provide the holders of Notes, through the closing of such Liquidity Event, the Target Multiple,"[13] and (ii) any Material Partial Sale, "unless the transaction giving rise to the Material Partial Sale yields proceeds equal to or greater than the amount which, if paid to the holders of the Notes would provide the holders of Notes, through the closing of such Material Partial Sale, the Target Multiple and the provisions of Section

---

[12] *Id.* at 4.

[13] JX 9 § 4.3(a).

1.5(e) (other than the last sentence thereof) are complied with."[14] In the latter scenario, the Series A Agreement required Invenergy to offer to repurchase the Series A Notes for the Target Multiple. At that point, each of the holders of the Series A Notes could choose whether to accept the offer or retain their notes to preserve the possibility of greater equity upside. The operative language stated:

> Upon the occurrence of any Material Partial Sale that has not been consented to by the Required Purchasers pursuant to Section 4.3(b) which (i) is not a Liquidity Event, (ii) occurs prior to the Third Anniversary and (iii) yields cash proceeds to the Company equal to or greater than the Target Multiple of all outstanding Notes, the Company must offer to prepay the Notes for an amount sufficient to cause the Holders to receive the Target Multiple, and each holder of the Notes may choose . . . to accept or reject such offer. . . . If any Material Partial Sale occurs on or after the Third Anniversary that has not been consented to pursuant to Section 4.3(b), the Company shall use the entire net proceeds of such sale to prepay the Notes together with any accrued but unpaid interest thereon and any applicable premium contemplated by Section 1.5(c) as in effect on the closing of the Material Partial Sale upon the closing of the Material Partial Sale.[15]

In contrast to the Series A Agreement, Invenergy's initial term sheet for the Series B Notes contemplated dropping the consent requirement for a Material Partial Sale. It also contemplated flipping the optionality so that instead of the noteholders deciding whether to cash out, Invenergy could choose whether to offer to buy them out.

---

[14] *Id.* § 4.3(b).

[15] *Id.* § 1.5(e); *see also* Murphy Tr. 589-90 ("[Section 1.5(e)] provides for payment in the event that the company is going to make a material partial sale, which is not a liquidity event, and the company has not obtained the consent of the required purchasers. . . . [I]f the company elected to bypass the consent right, then the noteholders, we understood, wanted to have the ability to make an election to be paid.").

Liberty rejected these proposals. In its counterproposal on behalf of the investors, Liberty added a consent requirement for a Material Partial Sale.[16] Liberty also struck the language that would have given Invenergy optionality on repurchasing the Series B Notes after a Material Partial Sale. In its place, Liberty substituted the following:

> Upon the occurrence of any Material Partial Sale (as defined herein below) that has not been consented to by the Required Purchasers pursuant to the negative covenants below which (i) is not a Control Transaction, (ii) occurs prior to the Conversion Deadline and (iii) yields cash proceeds to the Company equal to or greater than the Target Multiple of all outstanding Series B Notes, the Company must offer to prepay the Series B Notes for an amount sufficient to cause the holders thereof to receive the Target Multiple . . . .[17]

Liberty's counterproposal thus restored the consent requirement and gave the investors the optionality they enjoyed under the Series A Agreement. The final term sheet reflected Liberty's changes.[18]

Liberty also added to the term sheet a series of governance rights that the LLC Agreement would afford the Series B Investors if they converted into equity. Liberty's changes contemplated that Invenergy would need to obtain approval from the holders of a majority of the unaffiliated interests before engaging in a long list of corporate actions, including: "Cause a Material Partial Sale unless the transaction would provide the holders of equity other than IWH with the Target Multiple. Any such transaction may be structured

---

[16] JX 21 at 26-27.

[17] *Id.* at 21; Alemu Tr. 29-31.

[18] JX 32; Alemu Tr. 31-33.

8

to provide IWH with lower proceeds on a pro rata basis in order to yield the Target Multiple."[19] The final term sheet included a lengthier version of this provision.[20]

Yonatan Alemu oversaw the investment for Leaf. Alemu testified without contradiction that the parties intended for the Series B Investors' post-conversion governance rights to "function in a similar fashion" as their pre-conversion consent rights.[21] He understood that "to the extent the company did not get consent from the investors that had the equity, that they had an obligation to pay the target multiple."[22]

## C. The Series B Agreement

After reaching agreement on the term sheet, the parties negotiated binding transaction documents. The governing agreement was the Series B Senior Subordinated Convertible Note Purchase Agreement dated as of December 22, 2008 (the "Series B Agreement"). In an initial closing, which took place on December 22, Liberty invested $100 million in the Series B Notes, Leaf invested $20 million, and Invenergy Financing invested $10 million.[23] In a secondary closing in February 2009, Leaf invested another $10

---

[19] JX 21 at 33.

[20] JX 32 at 11.

[21] Alemu Tr. 34.

[22] *Id.*

[23] PTO ¶ II.B.5.

million.[24] Shortly thereafter, Banc of America Strategic Investments Corporation invested $20 million.[25]

Under the Series B Agreement, the Series B Notes paid interest at 8% per annum and matured on December 22, 2014.[26] Invenergy could not prepay the Series B Notes before December 22, 2011, a date defined as the "Conversion Deadline."[27] After the Conversion Deadline, the Company could prepay the Series B Notes for principal plus interest. For purposes of the prepayment, principal would be calculated at 105% of the face amount if paid before December 22, 2012, and 102% of the face amount if paid thereafter until December 22, 2013, with no premium after that date.[28] Any Series B Investor could convert "all, but not less than all" of its Series B Notes into equity at any time "on or prior to the Conversion Deadline," with the resulting number of member interests determined by formula.[29] As a practical matter, if the Company did poorly, then the Series B Investors would stay in the notes and preserve their debt-based rights to recover their principal and

---

[24] *Id.*; *see also* JX 36 (closing set for follow-on investment); JX 40 at 1 (internal email seeking approval of Leaf board for follow-on investment); Alemu Tr. 16, 20; Murphy Tr. 591-92.

[25] PTO ¶ II.B.6.

[26] JX 37 § 1.4(a), (b).

[27] *Id.* art. X.

[28] *Id.* § 1.4(c).

[29] *Id.* § 1.5(a).

10

interest. If the Company did well, then the Series B Investors would convert into equity before the Conversion Deadline to capture the equity upside.

The Series B Agreement incorporated by reference a form of the LLC Agreement that would govern Invenergy once a Series B Investor converted its Series B Notes into member interests (the "Series B LLC Agreement").[30] The Series B LLC Agreement anticipated that absent some other transactional development, the Series B Investors would remain as members for up to three years after the Conversion Deadline, for a total investment period of five to six years.[31] To facilitate exit, Section 11.09 of the Series B LLC Agreement established reciprocal put and call rights that the parties could exercise between December 22, 2013 and December 22, 2014. During that window, any member who held equity interests as a result of converting Series B Notes could "require that the Company purchase all but not less than all" of its interests.[32] Likewise, during the same window, the Company could "redeem all but not less than all of the Company Interests held by" such members.[33]

In each case, the Series B LLC Agreement defined the price for the redemption as "Fair Market Value." The Series B LLC Agreement defined Fair Market Value in

---

[30] *See* JX 38 at 75.

[31] *See* JX 24 at 9 (Leaf presentation stating "Exit assumed to occur in 2013").

[32] JX 38 at 116.

[33] *Id.*

decidedly pro-investor fashion: "the product of (x) *the highest price per unit of equity interest* which the Company could obtain from a willing buyer (not a current employee or director) for the Company's Company Interests in a transaction involving the sale by the Company of all equity interests times (y) the number of Company Interests being valued."[34] The definition further specified that when "there is not an active trading market, the appraisers shall value the interests without ascribing a minority interest or illiquidity discount."[35] To determine Fair Market Value, the parties first would attempt to negotiate in good faith. If they could not agree, then the Series B LLC Agreement provided for a process in which each side would choose an appraiser to value the Company and the resulting price would be the average of the two appraisals. If the first two appraisals varied by more than 20%, then the parties would jointly choose a third appraiser and the value would be the average of all three appraisals.[36] This decision refers to these aspects of the LLC Agreement as the Put Right, the Call Right, and the Put-Call Provisions.

If a Series B Investor triggered its Put Right and Invenergy failed to repurchase the interests, then the Series B Investor gained additional rights, including the right to compel

---

[34] *Id.* at 85 (emphasis added). This standard applied if Invenergy remained privately held and was not contemporaneously engaging in a sale transaction. If Invenergy was publicly traded, then Fair Market Value would equal the trading price. If Invenergy agreed to be acquired, then Fair Market Value would be the deal price. *See id.*

[35] *Id.*

[36] *Id.*

a sale of the Company to a third party.[37] The practical effect of the Put-Call Provisions was to force an exit or renegotiation of the Series B Investors' rights within six years after their initial investment in December 2008.[38]

While their capital remained committed to Invenergy, the Series B Investors enjoyed various approval rights. Section 4.3 of the Series B Agreement contained a lengthy list of actions that the Company could not take without first securing the approval of holders of a majority in value of the Series B Notes.

Section 4.3(b) specified that Invenergy had to secure the necessary vote before engaging in a Material Partial Sale. The relevant language stated:

> 4.3    On or prior to the Conversion Deadline, without the consent of the Required Purchasers, the Company shall not:
>
> . . .
>
>    (b)    sell (in one of more transactions within any period of twelve (12) consecutive months) assets of the Company or assets of its Subsidiaries for value greater than 20% of the value of the Company (such values being net present values of the pro forma after tax cash flow of such assets to be sold as compared to the pro forma after tax cash flow of all assets of the Company and its Subsidiaries, in each case based on the Company's then current business plan prepared in good faith and calculated as provided in the Projections or such other model worksheet used by the Company at such time and reasonably acceptable to the Holders and discounted at a ten percent (10%) net present value discount rate) (a "Material Partial Sale"), unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal

---

[37] *See id.* at 117.

[38] *Cf.* JX 61 (noting in context of later negotiation in 2012 that the "put option that Leaf retains can be used to force some type of a liquidity or recap event"); JX 63 at 1 (same).

to or greater than the amount which, if such cash were paid to the holders of the Notes would provide the holders of Notes, through the closing of such Material Partial sale, the Target Multiple in cash and the provisions of Section 1.4(e) (other than the last sentence thereof) are complied with.[39]

The cross reference to Section 1.4(e) identified a provision that obligated Invenergy to offer to purchase the Series B Notes in the event of a Material Partial Sale. It stated, in relevant part:

> Upon the occurrence of any Material Partial Sale that has not been consented to by the Required Purchasers pursuant to Section 4.3(b) which (i) is not a Liquidity Event, (ii) occurs on or prior to the Conversion Deadline and (iii) yields cash proceeds to the Company equal to or greater than the Target Multiple of all outstanding Notes, the Company must offer to prepay the Notes for an amount sufficient to cause the Holders to receive the Target Multiple, and each holder of the Notes may choose . . . to accept or reject such offer. . . . If any Material Partial Sale occurs after the Conversion Deadline that has not been consented to pursuant to Section 4.4(b), the Company shall use the entire net proceeds of such sale to prepay the Notes together with any accrued but unpaid interest thereon and any applicable premium contemplated by Section 1.4(c) as in effect on the closing of the Material Partial Sale upon the closing of the Material Partial Sale.[40]

These provisions documented the business agreement reached when the parties negotiated the term sheet for the Series B Notes. They were substantially identical to similar provisions in the Series A Agreement.[41]

The parties have debated the implications of the presence of Section 1.4(e) in the Series B Agreement. In my view, its presence primarily reflected the fact that during the

---

[39] JX 37 § 4.3(b).

[40] *Id.* § 1.4(e).

[41] *See* JX 9.

14

period when their investment was governed by that agreement, the Series B Investors held debt. Absent a provision like Section 1.4(e), Invenergy might argue that the Series B Investors only would be entitled to payment of principal and interest if the Series B Consent Right was breached. Under Section 9.1(a)(3) of the Series B Agreement, breach of the Series B Consent Right would be an "Event of Default," because it would result in a situation in which "the Company . . . defaults in any material respect in the performance or observance of any other covenant term or condition [other than the payment of principal or interest when due] contained in the Notes, this Agreement or the Related Agreements."[42] The Series B Agreement provided that upon an Event of Default, the unpaid principal and accrued but unpaid interest on the Series B Notes would accelerate and become due. But that was not what the Series B Investors wanted to receive in that situation. They wanted the equity upside of the Target Multiple. To avoid creating a loophole that might enable Invenergy to extinguish the Series B Notes prematurely by engaging in a Material Partial Sale, the drafters of the Series B Agreement included Section 1.4(e). That section provided explicitly that Invenergy had to pay the investors the Target Multiple, not just principal and interest.

In my view, another purpose for Section 1.4(e) was to reflect the parties' agreement that the holders of the Series B Notes would have optionality as to whether they wanted to (i) accept the Target Multiple and exit or (ii) retain their Series B Notes and the possibility

---

[42] JX 37, § 9.1(a)(3).

15

of greater equity upside. The parties could have drafted Section 1.4(e) to require the investors to transact in return for the Target Multiple. Instead, the parties required Invenergy to offer to purchase the Series B Notes, at which point the Series B Investors could choose what to do. As in the term sheet, the optionality rested with the investors.

As noted previously, the Series B Agreement incorporated by reference the Series B LLC Agreement, which would govern the Series B Investors' rights once they converted to equity. Under the Series B LLC Agreement, the Series B Investors would continue to enjoy significant governance rights comparable to those in the Series B Notes following their conversion into equity. In Section 8.01, titled "Significant Actions," the Series B LLC Agreement contained a lengthy list of items that required the approval of at least two unaffiliated members holding at least 50% of the equity in the aggregate.[43] The list of actions included a Material Partial Sale. The operative language stated:

> Without the prior written consent of . . . the Required Investor Members, the Company shall not:
>
> . . .
>
> (b) sell [enough] assets of the Company or assets or equity of its Subsidiaries [to constitute a Material Partial Sale] . . . , unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that, if received, would provide the Members other than IWH, as of the closing of such Material Partial Sale, their applicable Target Multiple in cash. Any such transaction may be structured to provide IWH with lower proceeds on a pro rata basis as the other Members in order to yield such Members with their applicable Target Multiple in cash.[44]

---

[43] *See* JX 38 at 34 (definition of "Required Investor Members").

[44] *Id.* at 49.

This language paralleled the Series B Consent Right that appeared in the Series B Agreement.

The Series B LLC Agreement did not contain an analog to Section 1.4(e) of the Series B Agreement. Once again, the parties have debated the significance of this fact. In my view, its absence does not imply an intent that the investors would not receive their Target Multiple if a Material Partial Sale took place. Having considered the record, I believe its absence simply reflected the fact that once the Series B Investors had converted to equity, there was no longer any need for a contractual protection that would rule out the possibility of Invenergy paying off the investors for principal plus accrued interest. It is true that the issue of optionality still existed, but the parties do not appear to have contemplated that point in 2008. They seem to have thought that if the investors received their Target Multiple, then the investors would exit happily. The question of optionality for the equity would resurface in 2014.

## D.    The 2011 Amendment

In mid-2011, Invenergy wanted to prepay a large loan and establish a new term-loan facility.[45] As part of that process, Invenergy proposed to extend the maturity of the Series B Notes by two years, push out the Conversion Deadline by two years, align the terms of

---

[45] *See* JX 47-48 (executed "Payoff of Credit Agreement and Release of Security Interests"); Alemu Tr. 36-37.

the Series A Notes and Series B Notes, and modify the return thresholds in light of the alignment and longer term.[46]

The Series B Investors accepted Invenergy's changes but insisted on better return thresholds than what Invenergy proposed. Under the new arrangement, the amended Series B Agreement would guarantee the Series B Investors an internal rate of return ("IRR") of 20.51% in the event of a Material Partial Sale while in the notes, which represented a higher amount than the original deal. After conversion, the guaranteed IRR would be 25%, representing a decrease from the 27% minimum IRR contemplated in the original deal, and the rate of return would decline by 2% each year thereafter.[47] Joseph Condo, Invenergy's General Counsel, marked up the Series B Agreement and the Series B LLC Agreement to modify the definition of "Target Multiple" that appeared in each to reflect the new IRR arrangement.[48]

Underlying the parties' discussions of the Target Multiple as a return floor was the premise that in any scenario in which Invenergy engaged in a Material Partial Sale without the Series B Investors' consent, the Series B Investors would receive their Target

---

[46] *See* JX 49; JX 51-52; JX 54.

[47] *See* JX 49 (email between Liberty and Leaf showing IRR decline following conversion); JX 52 (email summarizing proposed IRR structure).

[48] *See* JX 53.

Multiple.[49] The Liberty and Leaf investor representatives testified to that effect,[50] and the contemporaneous documents reflect this understanding. For example in December 2011, when Alemu sought approval from Leaf's board of directors to execute the amendment, he noted that "Series B investors will continue to get a 20.5% IRR protection while still in the note if Invenergy wanted to pursue a transaction/liquidity event without getting consent of investors."[51] He continued:

> Target multiples (designed to yield cash on cash rate of return) for Series B investors post a conversion to company equity were slightly modified. These target multiples would protect investors from a material partial sale or the sale of Invenergy if such a transaction was pursued without the consent of Series B investors.[52]

Leaf's board signed off, and the parties executed the amendment on December 21.[53]

---

[49] *See* Alemu Tr. 44-46.

[50] *See, e.g.*, Fontanes Tr. 416-17 (agreeing that "Invenergy had basically two options in a material partial sale under the LLC; either get consent from Liberty or pay it its material partial sale amount"); Alemu Tr. 40 ("So under both. They worked exactly in the same fashion.").

[51] JX 54.

[52] *Id.*

[53] PTO ¶ II.B.7. To facilitate the amendment, the Series B Investors exchanged their existing securities for Series B-2 Notes, and the parties entered into a new Series B-2 Agreement. *See* JX 58 § 1.5(b). For purposes of the operative provisions in this case, the features of the securities did not change. For simplicity, this decision continues to refer to the Series B Agreement and the Series B Notes.

19

**E. The CDPQ Investment**

At the end of 2012, Invenergy proposed to raise capital from Caisse de dépôt et placement du Québec ("CDPQ"), a large Canadian pension fund. Among other things, Invenergy would use the capital to pay off Citigroup's Series A Notes. The capital raise required consent from the Series B Investors. In return for their consent, Invenergy agreed to extend the Conversion Deadline from 2013 to 2015.[54] In January 2013, Invenergy issued Series C Senior Subordinated Notes (the "Series C Notes") to CDPQ. Invenergy used the proceeds to redeem Citigroup's position, leaving Liberty as the dominant holder of the Series A Notes.[55]

**F. The Liberty Conversion**

In summer 2013, Invenergy and Liberty discussed having Liberty convert some of its Series A Notes and all of its Series B Notes into equity. As part of the conversion, Liberty wanted greater governance rights for its equity, but Liberty and Invenergy did not want Leaf to share in those rights. Liberty and Invenergy also expressed concern that if Liberty converted all of its Series B Notes, then Leaf would be the only holder of Series B Notes and would have the ability to control the vote necessary for certain transactions.[56]

---

[54] JX 63 (internal Leaf email soliciting approval of the amendment); JX 64 (signed amendment).

[55] PTO ¶ II.B.9.

[56] *See* Murphy Tr. 597-99.

Leaf believed that having Liberty convert to equity would benefit Invenergy. It therefore would benefit Leaf indirectly. To facilitate the conversion, Leaf agreed to "[a]ppropriate modifications" to the Series B Agreement "in order to limit Leaf's blocking rights."[57] Relevant to the current lawsuit, the parties agreed to separate Liberty and Leaf's consent rights in the amended operating agreement that would recognize Liberty as a member post-conversion. Liberty's rights remained in Section 8.01 and were supplemented with additional provisions.[58] Leaf's rights were relocated to what eventually became Section 8.04 in the operative LLC Agreement.[59]

Despite being relocated, the substance of Leaf's rights remained the same. Invenergy still required Leaf's consent for any Material Partial Sale "unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that, if received, would provide [Leaf], as of the closing of such Material Partial Sale, with cash proceeds equal to or more than [its] applicable Target Multiple."[60]

On July 1, 2013, Liberty converted $12.5 million of its Series A Notes and all of its Series B Notes into equity.[61] In connection with the conversion and Invenergy's

---

[57] JX 63 at 1; JX 64.

[58] JX 85 § 8.01(b), (e), (f); *see also* JX 74 at 44-48 (redline reflecting changes); Alemu Tr. 53-54 (discussing changes).

[59] Alemu Tr. 51-53.

[60] JX 85 § 8.02(b).

[61] PTO ¶ II.B.10.

21

recognition of Liberty as a member, Liberty, Invenergy, and Invenergy Holdings entered into a Second Amended and Restated Limited Liability Company Operating Agreement.[62]

## G. Leaf Explores Liquidating Its Position.

In spring 2014, Leaf's parent company decided to begin an orderly liquidation of its investments. As part of this strategy, Leaf explored ways to exit its investment in Invenergy. In March 2014, Alemu and other members of management prepared a presentation that analyzed exit scenarios for Leaf.[63] The presentation showed that Leaf's principals understood that Leaf would be entitled to receive its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent regardless of whether Leaf held debt or equity.[64] The analysis showed that for an exit in December 2015, Leaf would receive greater value under the LLC Agreement than under the Series B Agreement, because the former called for a guaranteed IRR of 23%, whereas the latter used an IRR of 20.5%.[65]

---

[62] *See* JX 85.

[63] JX 99 at 3; Alemu Tr. 55-57.

[64] JX 99 at 7 ("Prior to December 22, 2015, the Investor Holders of the Series B notes must approve any Invenergy liquidity event or material partial sale that does not yield a 20.5% IRR."); *id.* at 10 ("Prior to December 22, 2015, all Series B Investor Members must approve any Invenergy liquidity event or material partial sale that does not yield a cash-on-cash IRR . . . .").

[65] *See* Alemu Tr. 58-61 (explaining that LLC Agreement provided for higher IRR for calculating Target Multiple than Series B Agreement). *Compare* JX 99 at 7 (calculating Target Multiple of $110,670,172 for Series B Notes in December 2015 using 20.5% IRR),

On April 1, 2014, Leaf's parent hired Mark Lerdal to oversee the orderly liquidation. Lerdal's compensation consists of a base salary plus an incentive fee tied to the value of the returns he generates through the liquidation process.[66] This arrangement gives him an economic interest in securing the highest possible value for Leaf's position in Invenergy.

One option Leaf considered was to sell its position to a third party. In May 2014, Leaf began interviewing investment banks to help with the sale process. The interview materials described the Series B Consent Right in the same terms as the March 2014 board presentation and depicted the same exit valuations.[67]

## H. Invenergy's CFO And Its General Counsel Confirm Leaf's Understanding.

In spring 2014, CDPQ, Liberty, and Invenergy were considering a recapitalization in which CDPQ would purchase additional equity and Liberty would convert more of its debt into equity. The deal contemplated changes to the LLC Agreement and the Series B Agreement and would require Leaf's consent.[68]

Shashank Sane was a Vice President at Invenergy who reported directly to Jim Murphy, Invenergy's CFO. To assist in negotiating the revised documents, Sane prepared

---

*with* JX 99 at 10 (calculating Target Multiple of $127,778,279 for equity in December 2015 using 23% IRR).

[66] *See* JX 100 (executed employment agreement); Lerdal Tr. 234.

[67] *See* JX 108 at 2, 5; *see also* Lerdal Tr. 238-43 (discussing the deck).

[68] JX 116 (Leaf internal email from Alemu summarizing discussions with Invenergy).

and circulated a "matrix comparing member rights in the LLC agreement."[69] The matrix summarized Leaf's rights in the event of a Material Partial Sale as follows: "Consent required, unless paying COC amount" and "Leaf COC Amount is Target Multiple."[70] Sane revised the matrix several times under the supervision of Murphy and Condo, Invenergy's General Counsel.[71] The description of Leaf's rights in the event of a Material Partial Sale never substantively changed.[72]

During the negotiations, CDPQ and Liberty asked Invenergy to add language to the LLC Agreement that would give them the option upon the occurrence of a Material Partial Sale to either receive their Target Multiple or stay in the equity. In other words, their member interests would have the same optionality as their notes. In 2013, when the parties had separated Leaf's consent rights from the other investors' and moved them to a different section of the LLC Agreement, they had redefined the Target Multiple that CDPQ and Liberty would receive in the event of a Material Partial Sale as the "Material Partial Sale Amount." Now, CDPQ and Liberty asked for the option to choose whether or not to receive

---

[69] JX 109 at 1.

[70] *Id.* at 5.

[71] *See* JX 111-12; *see also* Murphy Tr. 665-72.

[72] In the final version, Sane changed the generic "COC" to "MPS." The relevant bullets read: "Consent required, unless paying MPS amount" and "Leaf MPS amount is Target Multiple." JX 112.

their Material Partial Sale Amount if a Material Partial Sale took place. They proposed the following language:

> In the event of a Material Partial Sale, any Member who is not a Specified Member (excluding Leaf Invenergy Company) shall have the right to elect in writing, within thirty (30) days after its receipt of the 30-day notice referred to directly below, to receive cash proceeds equal to the Material Partial Sale Amount.[73]

Invenergy shared the draft with Leaf.

Leaf initially considered whether it had the right to block the recapitalization and could use that right to facilitate an exit. In an email dated May 21, 2014, Lerdal asked Alemu, "Why don't we ask for our guaranteed return today? Do we have any blocking rights? If so, this is the time to tell them we will approve no change to the operating agreement."[74] Alemu responded that Leaf did not have blocking rights and that Leaf's "guaranteed return"— its right to receive its Target Multiple—was "only triggered if they undertake a material partial sale (dispose [of] 20% of the assets) or [] consummate [a] change of control without seeking our consent."[75] Both Alemu and Lerdal testified credibly to their contemporaneous expectation that if Invenergy engaged in a Material Partial Sale without Leaf's consent, then Invenergy would have to pay Leaf its Target Multiple.[76]

---

[73] JX 117 § 8.01(e).

[74] JX 121 at 1.

[75] *Id.*

[76] Alemu Tr. 64-65 ("[T]o the extent they didn't get our consent, the company had an obligation to pay, so that's what [] I was reflecting in that email."); Lerdal Tr. 246 ("We

25

Leaf retained Mike Russell at Wilson Sonsini Goodrich & Rosati, P.C. to provide advice on the proposed changes to Invenergy's governing documents.[77] In an email dated May 27, 2014, Russell asked Condo why Leaf would not be included in CDPQ and Liberty's proposal for new language in Section 8.01(e).[78] He wanted to know "what happens to Leaf in this scenario?"[79]

Condo responded that the section did not address Leaf because "Leaf's rights in the event of an MPS are specified explicitly in Section 8.04(b)."[80] That answer did not respond to the substance of Russell's question, so Russell followed up by explaining that Section 8.04(b)

> doesn't actually provide a payout to Leaf, whereas 8.01(e) provides for a payout to the non-Specified Members. Is there a reason why Leaf doesn't have a right to elect to receive the payout in the Material Partial Sale? If they can't elect to receive it, how are they assured to receive their Target Multiple in the transaction?[81]

---

thought it was guaranteed. We thought if the transaction happened and -- and we weren't -- and we didn't consent, they were obligated to pay that to us.").

[77] *See* JX 117-18; Alemu Tr. 62.

[78] JX 128 at 4.

[79] *Id.*; *see also* Russel Tr. 481-83.

[80] JX 128 at 3.

[81] *Id.* at 2; *see also* Russell Tr. 482-85 (testifying that after reviewing proposed Section 8.01(e), it "stood out" that Leaf did not have a "specific election right" like Liberty did under the provision).

Condo responded clearly and directly: "[I]t is a firm consent right that we can't do a C of C absent Leaf's consent if the Target Multiple is not reach[ed]. *So unless they consent not to receive it, they will always get it.*"[82] At trial, Condo acknowledged that his reference to "C of C" encompassed a Material Partial Sale.[83] Russell reasonably perceived Condo to be saying that if a Material Partial Sale took place and Leaf did not consent, then "[y]ou'll get paid."[84]

Although Russell and Condo both understood the provision to work in the same way, Russell remained concerned that the language was not sufficiently clear. He observed that under the language as drafted, "Leaf does not have a consent right if the cash proceeds, 'if received', would be equal to or greater than the Target Multiple. There is no obligation to actually deliver the cash proceeds."[85] Condo reassured Russell: "The intent is that Leaf receives its TM. Do we need language to clarify?"[86]

After this exchange, both lawyers asked the business principals to confirm their understanding about how the provision worked. Condo emailed Murphy and asked, "Jim - do you agree that the intent is that absent their consent not to get it, Leaf is entitled to

---

[82] JX 128 at 2 (emphasis added).

[83] Condo Tr. 440.

[84] Russell Tr. 487 ("He said they'll always get it, so he just seemed to be saying, 'You'll get paid.'").

[85] JX 128 at 2.

[86] *Id.* at 1.

receive their TM? They are wrapped around the axle on a semantic game thinking we don't actually have to pay them."[87] Murphy responded: "Yes I agree."[88] Condo responded, "OK – I will work with them on reassuring language."[89]

Meanwhile, Russell followed up with Leaf. Russell knew that Leaf believed it should have the right to receive its Target Multiple if Invenergy completed a Material Partial Sale without Leaf's consent. His question was whether Leaf wanted to receive its payment automatically, or whether Leaf wanted the same optionality that it had under the Series B Notes and which CDPQ and Liberty were obtaining for their equity. Russell asked Alemu, "[I]n the situation with a material partial sale, will you want to automatically receive your target multiple or have the ability to elect to receive it, similar to the other non-Specified Members."[90] Alemu responded, "We would like to receive it automatically."[91] Russell passed Leaf's response on to Condo: "Joe, Leaf confirmed that they would expect to receive the payout associated with the Material Partial Sale automatically, so we would appreciate if language could be added to clarify."[92]

---

[87] JX 124.

[88] *Id.*

[89] *Id.*

[90] JX 126 at 1.

[91] *Id.*

[92] JX 128 at 1; *see also* Russell Tr. 488-89.

28

At this point, the business principals for both sides (Murphy and Alemu) and the lawyers for both sides (Condo and Russell) shared a uniform understanding about how the Series B Consent Right worked: If Invenergy engaged in a Material Partial Sale without obtaining Leaf's consent, then "Leaf receives its TM."[93] There were no ifs, ands, or buts: "[U]nless they [Leaf] consent not to receive it, they will always get it."[94] The only question was how to make sure the language sufficiently confirmed this shared understanding.

Condo asked for Murphy's sign-off on the following language:

> [Invenergy shall not] participate in or permit a Material Partial Sale, unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that, if received, would provide the Series B Non-Voting Investor Members, as of the closing of such Material Partial Sale, with cash proceeds equal to or more than their applicable Target Multiple, with such Target Multiple to be paid upon such closing of the Material Partial Sale.[95]

With Murphy's approval, Condo sent the language to Russell.[96]

Russell was "satisfied with the language" that Condo had proposed,[97] but it occurred to him that if a Material Partial Sale resulted in proceeds that could support a distribution greater than the Target Multiple, then Leaf should receive the greater value and not be

---

[93] JX 128 at 1 (Condo).

[94] JX 128 at 2 (Condo).

[95] JX 125 at 1.

[96] JX 128 at 1; *see also* Alemu Tr. 70; Russell Tr. 489-90.

[97] Russell Tr. 490.

capped at its Target Multiple. He wrote to Alemu: "Not sure that you should only be paid your Target Multiple – i.e. if the payout is higher, shouldn't you receive the full amount?"[98] Alemu understandably liked that idea and responded: "We should have the ability to take the greater of the target multiple or pro rata value of a transaction."[99] Russell informed Condo that Leaf believed that "[t]he payout shouldn't be limited to the Target Multiple if the transaction would result in a higher payout based on their then pro-rata ownership."[100] Russell asked Condo to "modify [his proposed language] to provide for a payout of the greater of the Target Multiple or their pro rata share of the transaction value."[101]

Condo correctly perceived that Leaf was now asking for something more than what everyone had understood the deal to be. He emailed Murphy:

> Now Leaf wants to not be limited to the Target Multiple if an MPS would result in a higher payout based on their then pro-rata ownership. They want a payout of the greater of the Target Multiple or their pro rata share of the transaction value. I don't think that was the deal – maybe you should talk with Yoni [Alemu] directly?[102]

---

[98] JX 129 at 1.

[99] *Id.*

[100] JX 132 at 1.

[101] *Id.*

[102] JX 127 at 2.

30

Murphy initially wondered why Leaf would need language giving them a right to greater transactional proceeds, asking "don't they get the pro rata payout by just agreeing to the transaction?"[103] Condo explained that for a Material Partial Sale that was not the case.

> No. The agreement generally does not specifically say so. Unless you are referring to the general distribution clause. But that has nothing to do with a Member consent – there is no direct benefit for a member to consent to an MPS. If they consent, it just means we can do the MPS at less than the TM.[104]

At this point, Murphy cut to the chase by laying out his understanding of the fundamental business deal:

> My understanding is:
>
> - If we do a material partial sale with their consent, we do the deal and if we have a distribution as a result we pay pro rata.
>
> - If we try to do an MPS and they don't consent, then we can transact anyway as long as we pay them the TM at which point they are out. Probably in this case we pay them more than their pro rata amount to get them to TM.
>
> That was the deal. No way we agree to modify. Should I call Yoni [Alemu]?[105]

Condo agreed and told Murphy, "Your understanding is right."[106]

---

[103] *Id.* at 1.

[104] *Id.*

[105] *Id.*

[106] JX 133 at 1.

Murphy scheduled a call with Alemu.[107] Ahead of the call, Murphy sent Alemu a summary of how he understood the current provision to operate. After quoting the language of Section 8.04(b) of the LLC Agreement, Murphy stated:

To summarize,

- If we do a material partial sale with your consent, the value is captured by the Company to the pro rata benefit of the members. And if we have a distribution as a result the value is pro rata.

- If we desire to do an MPS without your consent, then we can transact anyway as long as we pay you your Target Multiple, at which point you would no longer be a member.[108]

Murphy then moved on to the new point Leaf had raised: "My understanding is that there is a new request to modify the non-consent case such that your shares would need to be redeemed at the greater of (a) your Target Multiple and (b) your pro rata share of the transaction value?"[109] Murphy said that the ask "makes no sense to me" because "[i]f a Material Partial Sale is for say 20% of the Company value, how could your pro rata share realistically . . . exceed your Target Multiple? And why would you redeem 100% of your membership interest for 20% of your value?"[110]

---

[107] *See id.* (Murphy agreeing to call Alemu); JX 134 (Murphy and Condo discussing call).

[108] JX 135 at 1.

[109] *Id.*

[110] *Id.*

Internally, Murphy and Condo debated whether there was confusion over the fact that Invenergy would be redeeming Leaf's interests in return for paying the Target Multiple.[111] At Murphy's request, Condo drafted changes to the LLC Agreement that clarified that Invenergy would pay the Target Multiple in exchange for the member's equity interest; in other words, the payment would operate as a redemption.[112] Condo accomplished this by defining the Target Multiple as an amount that a Series B Investor would receive "in exchange for its portion of the Company Interests."[113]

Meanwhile, Alemu reviewed Murphy's email and agreed with his analysis. Alemu forwarded the email on to Russell and let him know that Leaf would not pursue the new point.[114] Russell viewed the point as a business matter involving economics rather than a legal issue and hence was "[f]ine deferring to you on this."[115] On May 29, 2014, Alemu

---

[111] *See* JX 140 at 2.

[112] *Id.* at 1-2; *see also* JX 147 at 1 (Condo writing to Murphy and Sane, "My take on this is simply that if they are entitled to a C of C Amount, MPS Amount or Target Multiple, they give up all Company interest."); *id.* (Sane agreeing, "If they trigger a COC amount, MPS amount or Target Multiple, it has to be the entire position.").

[113] JX 140 at 1.

[114] JX 136 at 1 (Alemu writing, "I will go back to him and accept their original proposal").

[115] *Id.*

told Murphy that Leaf was "fine with the language below (target multiple for MPS without consent)."[116]

Later that day, Condo sent Murphy and Sane a revised draft of the LLC Agreement containing the proposed language. In his cover email, he explained that based on his revisions, "8.04(b) reflects that Leaf actually gets paid the TM."[117] Murphy and Sane signed off.[118] Condo then circulated the changes to CDPQ and Liberty. He characterized the revisions as "minor changes at Leaf's request."[119] CDPQ and Liberty did not object.[120] During a subsequent email exchange, Condo confirmed for CDPQ that "[i]f a transaction entitles a Member to a C of C Amount, MPS Amount or Target Multiple, they give up all Company Interest."[121]

On July 3, 2014, Invenergy received regulatory approval for CDPQ's investment. On July 10, all of the members executed the Third Amended and Restated Limited Liability

---

[116] JX 141 at 1.

[117] JX 142 at 1.

[118] JX 143 at 1.

[119] JX 144 at 1 (cover email).

[120] *See* JX 148 (exchange between Invenergy, CDPQ, and Liberty discussing other changes in the agreement); JX 149 (same); Renault Tr. 371, 410-11 (CDPQ witness confirming that he was aware of the changes but did not spend too much time focusing on them).

[121] JX 148 at 1.

Company Agreement of Invenergy Wind LLC.[122] The LLC Agreement contained the changes to Section 8.04(b) negotiated between Russell and Condo. The provision now stated:

> Without prior written consent of (i) the Manager and (ii) the Required Series B Non-Voting Investor Members, the Company shall not:
>
> . . .
>
> (b) participate in or permit a Material Partial Sale, unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that would provide the Series B Non-Voting Investor Members, as of the closing of such Material Partial Sale, with cash proceeds equal to or more than their applicable Target Multiple with such Target Multiple to be paid upon such closing of the Material Partial Sale. At the option of all other Members, any such transaction may be structured to provide such other Members with lower proceeds on a pro rata basis as the Series B Non-Voting Investor Members in order to yield such Series B Non-Voting Investor Members with their Target Multiple.[123]

Leaf qualified as a Required Series B Non-Voting Investor Member. This is the operative version of the Series B Consent Right for purposes of this litigation.

## I.     Leaf Formalizes Its Plan For Orderly Liquidation.

In July 2014, Leaf's parent held a special meeting of stockholders at which it formally embarked on an orderly liquidation of its assets focused on "the return of capital to the shareholders, with no predetermined timeframe and in a manner that produces

---

[122] PTO ¶ II.C.3; JX 160 (the LLC Agreement); *see also* JX 159 (Amendment No. 1 to Second Amended and Restated Series B Senior Subordinated Convertible Note Purchase Agreement); JX 162 (press release announcing CDPQ investment in Invenergy).

[123] JX 160 § 8.04(b).

optimum realisation value to the shareholders."[124] Its annual report stated that Leaf was "currently evaluating options for monetising its investment in" Invenergy, which the report described as a "well-performing asset."[125]

That same month, Leaf engaged Dean Bradley Osborne Partners LLC ("Dean Partners") to market Leaf's position in the Series B Notes. Dean Partners' engagement letter provided for a flat fee of $1 million plus 10% of the consideration Leaf received for its position in excess of $57 million, subject to a $2 million cap for a sale to a buyer unaffiliated with Invenergy.[126] This partially contingent fee arrangement gave Dean Partners a financial incentive to seek a higher value for Leaf's position.

In its preliminary analyses, Dean Partners valued Leaf's positon at between $50 million and $79 million,[127] and Dean Partners proposed to market the position at approximately $70 million.[128] The face value of the Series B Notes, consisting of principal

---

[124] JX 155 at 5; *see also* Lerdal Tr. 236. Leaf's parent traded on the London Stock Exchange. In United Kingdom parlance, the special meeting was an "extraordinary general meeting."

[125] JX 155 at 6.

[126] JX 157 at 1 (executed Dean Partners engagement letter); *see also* Alemu Tr. 76.

[127] JX 166 at 3 (deck prepared by Dean Partners for Leaf).

[128] *See* JX 173 at 2 (notice to Invenergy of intent to transfer the notes, stating "we propose to transfer the Notes to Invenergy at a purchase price of $70,000,000 in cash consideration"); *see also* Lerdal Tr. 247-48.

and interest, was $46 million.[129] Dean Partners ascribed incremental value to the Series B Notes because of the Target Multiple, which Dean Partners regarded as a "guaranteed return upon liquidity event."[130] The marketing materials explained that "[p]rior to December 22, 2015, the note holders must approve any Invenergy liquidity event or material partial sale that does not yield a 20.5% IRR" and that "[o]nce converted to equity, investor must approve any Invenergy liquidity event that does not yield a return of $113.1MM, $126.4MM, and $136.6MM in December '14, '15, and '16, respectively."[131]

Before it could start marketing the Series B Notes, Leaf had to comply with a right-of-first-offer provision in the Series B Agreement. Section 11.2 required that Leaf deliver what the Series B Agreement termed a "Note Offer Notice" to Invenergy specifying a price and other proposed terms. Invenergy then had thirty days to consider the Note Offer Notice and submit a counter offer. If Invenergy countered, Leaf had thirty days to consider the counter. If Leaf rejected the counter, then Leaf had 120 days to sell the Series B Notes to a third party as long as "the consideration, terms and conditions offered by such third party are materially no less favorable to [Leaf] than is the Note Offer Notice."[132] Leaf and Dean

---

[129] JX 169 at 1 (Preliminary Information Memorandum prepared by Dean Partners).

[130] *Id.* at 3.

[131] *Id.*

[132] JX 88 § 11.2.

Partners did not expect Invenergy to cooperate with the right-of-first-offer process.[133] But Lerdal was not worried. He regarded the sales process as "not time sensitive" and, absent some intervening event, "fully expect[ed] to exercise" Leaf's Put Right in 2015.[134]

Dean Partners delivered Leaf's Note Offer Notice to Invenergy on October 24, 2014.[135] The Note Offer Notice invited Invenergy to repurchase the Series B Notes for $70 million rather than playing "appraisal roulette" after Leaf exercised its Put Right in December 2015.[136] Leaf stated that if Invenergy declined to purchase the Series B Notes, then Leaf would market them to third parties or "hold the notes until December, 2015, convert the notes into equity of Invenergy, and exercise the Put option."[137]

On November 3, 2014, Condo rejected the notice as defective. Invenergy took the positon that the Series B Agreement required Leaf to include "the identity of the proposed third party transferee (which must be a Qualified Transferee) and the price at which the

---

[133] *See* JX 170 at 2.

[134] *Id.* at 1 (email from Lerdal: "if the company is not going to work with us, we should run with our process. At a minimum just to send a message to the company that we are serious about this asset."); *see also* Lerdal Tr. 300-01.

[135] JX 176 at 1 (transmittal email); *see also* Alemu Tr. 77; Lerdal Tr. 247; Russell Tr. 504-05; Murphy Tr. 613-15.

[136] JX 179 (email between Dean Partners and Leaf); *see also* Lerdal Tr. 300; Dean Dep. 185-86.

[137] JX 176 at 1.

Holder intends to sell the Notes to such third party."[138] Invenergy thus construed the transfer procedures in the Series B Agreement as creating a right of first refusal, rather than a right of first offer. By letter dated January 27, 2015, Leaf disputed Invenergy's position, but did not pursue the matter further.[139]

## J.    Invenergy Considers A Material Partial Sale.

In late 2014, Invenergy began to consider selling some of its assets and retained Goldman Sachs & Co. LLC to assist with that process.[140] Murphy explained at trial that an investment vehicle called a "YieldCo" was "making its rounds on Wall Street."[141] In YieldCo deals, assets were being valued "significantly higher than how [Invenergy was] valuing assets, and we thought it might be a good time to test the market."[142] Goldman began exploring potential transactions and advised Invenergy that there was "significant value in the M&A market for [Invenergy's] high quality [wind] portfolio."[143]

---

[138] JX 177 at 1; *see also* Alemu Tr. 83; Lerdal Tr. 248; Russell Tr. 506-07.

[139] JX 182 at 2 (letter from Russell to Condo).

[140] Murphy Tr. 616-17; Polsky Dep. 48-49.

[141] Murphy Tr. 616.

[142] *Id.* at 616-17.

[143] JX 180 at 5 (Goldman deck sent to Invenergy).

Goldman marketed Invenergy's assets and pushed interested parties "for indicatives before March 17."[144] One of the interested parties was TerraForm Power, Inc., an owner and operator of renewable power assets. Lerdal served as a director of TerraForm and in that capacity learned in early March that TerraForm was preparing a bid. In what Lerdal candidly described as "not [his] proudest moment," he immediately notified Alemu that Invenergy was pursuing an asset sale.[145] Lerdal and Alemu were thrilled with the news, because they expected that the sale "was going to trigger the [Material Partial Sale clause]."[146] Alemu also thought that a transaction could establish "a really good precedent" for determining Invenergy's Fair Market Value under the Put-Call Provisions.[147]

For its part, Invenergy was exploring how it could engage in a transaction without securing Leaf's consent or paying Leaf its Target Multiple. Polsky was "convinced that we need to proceed with the wind asset sale to YieldCo, particularly considering [anticipated revenue declines in Poland]."[148] But "because of the behavior of Leaf . . . beginning in late 2014," Invenergy did not want Leaf to "have a consent right to this transaction."[149]

---

[144] JX 186 at 1 (email from Murphy to Polsky providing "updates").

[145] Lerdal Tr. 253-54; *see also* JX 188 (emails between Lerdal and Alemu regarding the sale); Alemu Tr. 85-87.

[146] Lerdal Tr. 254.

[147] JX 189 (email from Alemu to Lerdal).

[148] JX 197 (email from Polsky to Murphy); *see also* Polsky Dep. 50-51.

[149] Murphy Tr. 690.

Invenergy management calculated at the time that Leaf's Target Multiple was $95 million.[150]

One Invenergy strategy was to postpone disclosing the sale to Leaf for as long as possible.[151] Another was to explore what would happen "if we do an MPS (where proceeds exceed the Target Multiple) and simply do not offer the TM?"[152] Condo told Murphy that he was "happy to ask that of outside counsel," but he was blunt about what the Series B Agreement contemplated: "I don't see any plausible way to make that case. It's my view that the agreement is very clear that we have to offer the TM to them, which they could then take or stay in the note."[153] Murphy responded, "I admit it appears to be a long shot [but] we should at least ask about it."[154]

Condo asked. On March 10, 2015, he explained to outside counsel that Invenergy was "looking at a transaction that, by any measure, would be a Material Partial Sale under

---

[150] JX 191.

[151] *See* JX 192 at 1 (email from Condo to Invenergy management advising that Leaf had a right to attend noteholders' meetings but not members' meetings, "[s]o we don't need to be coy about separate meetings").

[152] *Id.* at 1.

[153] JX 193 at 2.

[154] *Id.*

this agreement."[155] Condo's email walked through the pertinent sections of the Series B

Agreement. He wrote that the Series B Consent Right

> says that we must get Leaf's consent if we want to complete a Material Partial Sale if the proceeds of such transaction are less than the amount of the Target Multiple. If the proceeds exceed the amount of the Target Multiple and we comply with Section 1.4(e), we don't need consent. The proceeds here would exceed the Target Multiple.[156]

Condo asked "whether there is any way to read this in a way that would <u>not</u> require us to

offer to pay the full Target Multiple."[157] He laid out several arguments:

- Perhaps we could make the case that because we don't need to get their consent in the first place since the transaction exceeds the Target Multiple, 1.4(e)(iv) wouldn't necessarily apply? Put another way, could we say 1.4(e) only applies if they <u>refuse</u> consent, as opposed to a case where we simply don't ask?

- Or is there some other way to say that the intent here is that for a high-value transaction, they benefit and we don't need to make such an offer?

- Or, maybe there would be a basis to say that their failure to simply consent to the transaction (it's a sole discretion consent per 11.15), if it values the company highly, is a bad faith action?[158]

---

[155] JX 194 at 1.

[156] *Id.*

[157] *Id.*

[158] *Id.* (formatting added).

Condo concluded: "You may think we are grasping a little, and you'd be right. But we are trying to see if we have any realistic alternatives here."[159] At the time, Condo and Murphy both believed that Invenergy had to pay Leaf its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent, and they believed any arguments to the contrary either did not exist or were unlikely to succeed.

In contrast with its efforts to develop arguments to avoid Leaf's consent rights, Invenergy sought consent from CDPQ and Liberty.[160] In mid-March 2015, Invenergy management met with CDPQ and Liberty in Chicago and explained the rationale for the sale.[161] CDPQ and Liberty saw "significant value in this transaction" but argued that "proceeds in excess of what [they] believe is reasonable should be distributed to the members."[162] Liberty and CDPQ balked at Invenergy's idea of using the proceeds to pay down debt.[163]

---

[159] *Id.*; *see also* Condo Tr. 425-26 (acknowledging the question "was one that I felt was something of a stretch" and that he "didn't really think there was really much merit" to his theories but that he sent the email "so that I could report back to my boss that I had run this down with outside counsel").

[160] *See* JX 195-96 (emails between Invenergy and CDPQ discussing potential asset sale); Murphy Tr. 687-89.

[161] JX 201 at 1 (email from Polsky to Liberty and CDPQ recapping meeting); *see also* Renault Tr. 376-80; Murphy Tr. 633; Polsky Dep. 104-05.

[162] JX 201 at 1.

[163] *Id.*

Polsky responded that reinvesting the proceeds in Invenergy's business would yield enough cash over time to begin making distributions to investors. He reminded CDPQ and Liberty that he was the largest equity holder and hence shared their interests.[164] Negotiations continued, and CDPQ and Liberty remained involved and generally supportive of the asset sale.[165]

## K.  Leaf Evaluates Its Options.

On March 23, 2015, a news article leaked that "Invenergy is understood to be considering a sale of the bulk of its generation fleet."[166] The article confirmed what Leaf already knew due to Lerdal's role as a director of TerraForm. Alemu noted that if the transaction were "consummated prior to Dec 22, 2015, we would be entitled to our target multiples."[167] He explained that the transaction

> would certainly constitute a material partial sale and Leaf would be entitled to its target multiple if the following conditions are met
>
> 1) Transaction occurs prior to Dec 22, 2015 and
>
> 2) If the sale would yield cash proceeds to Invenergy equal to or greater than the target multiple for all outstanding Series B-notes.[168]

---

[164] *Id.* at 2.

[165] *See* Renault Tr. 373; Murphy Tr. 633.

[166] JX 203 at 1.

[167] JX 204 at 1.

[168] *Id.*

44

He caveated that "[a]ll of the above assumes that we don't consent to the deal."[169] Dean Partners agreed with Alemu's analysis.[170] So did Russell.[171]

The Leaf team also analyzed Leaf's rights if it converted into equity. On April 27, 2015, Alemu advised Lerdal that under the LLC Agreement, "Invenergy would require consent from all of us (CDPQ, Liberty and Leaf) in order to undertake a material partial sale."[172] He also noted that "[c]onsent would not be required if they deliver consideration equal to or greater than the target multiples to the investors."[173] Alemu further observed that for a transaction prior to December 22, 2015, the Target Multiple for Leaf was higher under the LLC Agreement than under the Series B Agreement, meaning that Leaf would receive greater value if it converted into equity before a Material Partial Sale took place.[174]

Lerdal responded that Leaf "might want to convert soon" but cautioned that Leaf needed to "time this properly" because "[w]e want their deal to be fully baked before we tip our hand."[175] Lerdal anticipated that Invenergy "will fight the existence of an MPS" and

---

[169] *Id.*

[170] JX 208 at 2.

[171] JX 212 at 1.

[172] JX 222 at 1.

[173] *Id.*

[174] *Id.*

[175] JX 223 at 1.

that "they might push it off to after December 2015 to force us into the put call."[176] In other words, Lerdal believed that Invenergy might delay closing the Material Partial Sale and exercise its Call Right before the transaction closed to avoid paying the Target Multiple. That path did not worry Lerdal, because he believed that the Material Partial Sale would result in "a new floor valuation, much higher than currently" for determining Fair Market Value under the Put-Call Provisions.[177]

Alemu agreed. He also noted that "[t]he threshold for a MPS under the LLC agreement ($240 mm) is lower than that under the [Series B Agreement] (20% of the value of the company)," so it would be "very difficult for them to try and avoid having to pay target multiple if we convert and they consummate the transaction."[178]

---

[176] *Id.*; *see also* Lerdal Dep. 106 (testifying he was concerned that, if Invenergy was "aware of -- if they were contemplating our right to the target multiple, they might put it -- they might have a closing date after the date that they could call our shares").

[177] JX 223 at 1; *see also* Lerdal Tr. 305-07 (testifying he wanted the deal to close because Invenergy was "doing a very good deal for not themselves but for everyone" and was selling at "[i]f not the very top [of the market], very close" which would "give Leaf a better return under the appraisal process, either the put or the call").

[178] JX 223 at 1.

46

## L.     The TerraForm Bid

On June 4, 2015, TerraForm submitted its bid to purchase seven Invenergy projects for an aggregate price of approximately $2.4 billion.[179] On June 6, Invenergy accepted TerraForm's proposal and entered into an exclusive negotiation period.[180]

On June 16, 2015, Invenergy held a regularly scheduled meeting with its noteholders. Representatives of Invenergy, CDPQ, Liberty, and Leaf attended. No one mentioned the TerraForm deal.[181] Invenergy circulated fifty-five pages of materials for the meeting; none mentioned the pending transaction.[182]

By this point, Invenergy had decided not to seek Leaf's consent, but Invenergy had not settled on what argument it would use to justify that course of action. One approach was to depress the value of the deal below the Material Partial Sale threshold. Between June 15 and 16, 2015, Sane subjected various deal structures to an "MPS test" to determine whether they tripped the Material Partial Sale threshold in the Series B Agreement.[183] The original deal clearly did, but Sane developed variations that did not.[184] He settled on an

---

[179] JX 233 at 2.

[180] JX 235 at 5-6.

[181] Alemu Tr. 98-100; Murphy Tr. 701-02.

[182] JX 241.

[183] JX 244-45; *see also* Sane Tr. 735-41.

[184] *See* JX 242 at 3; JX 243 at 3; *see also* Sane Tr. 733-35.

analysis that increased the valuation of certain assets Invenergy was retaining while decreasing the valuation of certain assets it was selling.[185] Sane sent this revised analysis to Murphy for "external distribution."[186]

Meanwhile, Leaf had grown suspicious about Invenergy's continuing silence regarding the pending transaction.[187] On June 18, 2015, Leaf held a board meeting to decide on a course of action.[188] The board materials reflected Leaf's understanding that "[i]f Leaf withholds consent, Invenergy can proceed with the MPS transaction but would be obligated to deliver a target IRR to Leaf [of] 20.5% if Leaf holds [the] notes [and] 23% prior to December 22, 2015 and 21% thereafter, if Leaf converts to equity."[189] The presentation suggested that Invenergy might try to avoid paying the Target Multiple by "delay[ing] closing the transaction until December 22, 2015" and "call[ing] Leaf's position," thereby "requiring both parties to go through the [Fair Market Value] appraisal process."[190]

---

[185] *See* JX 245.

[186] *Id.*; *see also* Sane Tr. 738.

[187] *See* JX 239 (email from Dean Partners banker to Lerdal: "I am confident that these guys will attempt to screw you if there is a material partial sale. We will be ready."); JX 250 (email from Lerdal to Dean Partners: "Again, I have no confidence that Invenergy will honor any provision in the documents.").

[188] *See* JX 248 at 1 (email transmitting slides to Leaf board "for the purpose of our call tomorrow"); Alemu Tr. 100-01; Lerdal Tr. 259-60; Russell Tr. 513-14. *See generally* JX 248-49.

[189] JX 249 at 3 (formatting omitted).

[190] *Id.* at 8.

At the conclusion of the meeting, the Leaf board authorized Leaf to convert its position in the Series B Notes into membership interests.[191] Russell sent notice to Invenergy that Leaf was exercising its right to convert its full position.[192] After several days of silence, Russell followed up with Condo. Condo replied that Invenergy had decided to seek regulatory approval for the conversion.[193]

## M.    TerraForm And Invenergy Sign Up A Deal.

Invenergy and TerraForm continued full steam ahead on their deal.[194] Invenergy also continued negotiating the terms on which CDPQ and Liberty would consent to the transaction. Recognizing that they had leverage, CDPQ and Liberty sought to extract some consideration for themselves. The vehicle for the negotiations was a use-of-proceeds schedule to the written consent that would define how Invenergy could use the proceeds.

Initially, Invenergy prepared use-of-proceeds schedules for two possible transaction structures. In one, Invenergy would sell 100% of the assets that TerraForm wanted for cash proceeds of $1.4 billion plus assumption of approximately $800 million in debt. In the other, Invenergy would sell 90% of the assets for cash proceeds of $1.2 billion plus the

---

[191] Lerdal Tr. 259-61; Russell Tr. 522.

[192] *See* PTO ¶ II.D.2; JX 253 at 2 (exercise notice); *see also* Alemu Tr. 102-03; Russell Tr. 522.

[193] JX 272 at 1.

[194] *See* JX 251 (circulating draft consents to CDPQ and Liberty); JX 259 (email from Goldman discussing open points with TerraForm).

assumption of debt.[195] Under both structures, Invenergy would use the vast majority of the proceeds to repay debt, including the Series A Notes, the Series B Notes, and a loan from CDPQ secured by several of the assets being sold.[196] Both draft schedules contemplated CDPQ receiving a payment of $300 million for its loan.[197] Under the full-sale scenario, Invenergy would retain approximately $270 million in net proceeds; under the partial sale scenario it would retain approximately $141 million. Neither schedule contemplated any distributions to the equity holders other than tax distributions.[198]

On June 30, 2015, Invenergy and TerraForm executed a Purchase and Sale Agreement (the "TerraForm Agreement"), which called for a deal consistent with the 90% structure (the "TerraForm Transaction").[199] CDPQ and Liberty executed and delivered their consents on July 1.[200] At closing, Invenergy would receive cash proceeds of

---

[195] JX 265 at 7 (draft use-of-proceeds schedule).

[196] *See* Renault Tr. 382-87.

[197] JX 265 at 7. The final schedule attached to the executed consent reflected that the repayment comprised $250 million in principal and interest plus a $50 million prepayment premium. JX 281 at 2. The premium compensated CDPQ for foregoing approximately twenty-two years of expected interest on the long-term loan. Renault Tr. 384-86; Murphy Tr. 683-84.

[198] JX 265 at 7.

[199] *See* PTO ¶ II.D.3; JX 275 (executed Purchase and Sale Agreement).

[200] JX 281 at 21.

approximately $1.1 billion.[201] The final use-of-proceeds schedule called for the payment of $300 million to CDPQ, a payment of approximately $100 million to satisfy investors in the projects who had "tag along" rights upon their sale,[202] and additional amounts to pay certain equity holders in one of the projects.[203] After these payments, the TerraForm Transaction would yield net proceeds to Invenergy of approximately $230 million. From that amount, Invenergy would make a tax distribution to its members of approximately $123 million and retain approximately $107 million as working capital.[204] The final consent provided that it would be "null and void in the event the proceeds of the Transaction are not paid as set forth hereunder including Exhibit B (subject only to immaterial adjustments)."[205]

## N. Leaf Demands Payment.

On July 2, 2015, after Invenergy signed the TerraForm Agreement but before any public announcement of the TerraForm Transaction, Invenergy finally notified Leaf.[206] Murphy called Alemu and described the deal size and basic structure and relayed that

---

[201] *Id.*

[202] Murphy Tr. 634-35.

[203] Renault Tr. 388.

[204] JX 281 at 21.

[205] *Id.* at 5.

[206] PTO ¶ II.D.3.

51

Invenergy anticipated a principal closing in September and a secondary closing around year's end.[207] Murphy also described the use of proceeds, which included a reserve against Leaf's anticipated exercise of its Put Right. During the call, Murphy took the position that the TerraForm Transaction did not constitute a Material Partial Sale because "according to [Invenergy's] analysis . . . this transaction would be about 12% of [the] value of [the] business."[208] Murphy reported to Condo that Alemu "seemed quite pleased about the value that will accrue to the company."[209]

On July 6, 2015, Murphy sent Alemu an analysis which showed the TerraForm Transaction constituted 12.5% of the value of the Company.[210] Invenergy had achieved this percentage by retaining the 10% interest in the assets it sold and removing one of the projects from the sale.[211]

Invenergy publicly announced the TerraForm Transaction on July 6, 2015.[212] On July 10, Invenergy filed for regulatory approval of Leaf's conversion from debt to equity.[213]

---

[207] JX 285 at 1 (email from Alemu to Leaf management and advisors recapping call).

[208] *Id.*

[209] JX 286 at 1 (email from Murphy to Condo).

[210] JX 290 at 3.

[211] Sane Tr. 739-41.

[212] PTO ¶ II.D.3; JX 287 (press release).

[213] PTO ¶ II.D.4; JX 296 (application); JX 297 (email notifying Leaf of filing).

During the same period, Alemu sought backup documentation for Invenergy's analysis of the Material Partial Sale threshold.[214] Alemu's own analyses indicated that the value of the TerraForm Transaction qualified as a Material Partial Sale under the LLC Agreement.[215]

During a call on July 23, 2015, Alemu advised Murphy that Leaf had converted to equity before the execution of the TerraForm Agreement, that the TerraForm Transaction qualified as a Material Partial Sale under the terms of the LLC Agreement, and that Invenergy therefore had to obtain Leaf's consent for the TerraForm Transaction.[216] Murphy disagreed.[217] The call ended with the parties agreeing "there was not more to talk about and attorneys would be more appropriate parties to discuss these differences."[218] Leaf decided

---

[214] JX 298-300.

[215] JX 304 at 1.

[216] *See* JX 308 (calendar invitation scheduling call); JX 310 (internal Leaf email discussing agenda for call); *see also* JX 318 at 5 (Leaf CFO providing summary of Leaf's position to auditors: "Leaf considers itself to be in the equity as a result of its June 18, 2015 conversion notice, effective June 21, 2015 and the terms of the [LLC Agreement] apply. Therefore, the TerraForm deal is an MPS, since its value is much greater than $245mm. Invenergy cannot close an MPS (i.e. the TerraForm deal) until after Leaf's conversion is effective, and without providing 30 days['] prior notice of the deal to Leaf and requesting Leaf's consent to the deal. If Leaf does not consent (it will not), then Invenergy cannot close the deal without paying Leaf its Target Multiple (i.e. 23% cash on cash IRR since the first investment, which will be equal to approximately $120 million on 9/30/2015, the expected date of [the] closing of the deal.").

[217] JX 311 at 2 (email from Murphy to Invenergy management recapping conversation).

[218] *Id.*; *see also* Alemu Tr. 109-15; Murphy Tr. 630-31.

not to take any further action until it received a fully executed signature page to the LLC Agreement.[219]

## O. Leaf Becomes A Member.

Throughout the summer and into the fall of 2015, TerraForm and Invenergy plodded towards a closing. By the end of August, Murphy had grown anxious. He emailed a senior executive at TerraForm to remind him that Invenergy entered into the TerraForm Agreement "with the understanding that the transaction would be closed in the most expeditious manner . . . and in no event later than the stated deadline of December 15, 2015."[220] The market had softened for comparable assets, and Murphy wanted "to proceed forward to closing asap."[221]

Because of the delay, Invenergy secured a bridge loan of $100 million. CDPQ and Liberty agreed on a revised use-of-proceeds schedule that contemplated repaying the bridge loan.[222]

---

[219] JX 313 at 1 (email from Lerdal to members of Leaf board: "[T]he current plan is to take no action until Leaf has received a fully executed signature page to the LLC Agreement of Invenergy [W]ind, LLC.").

[220] JX 320 at 2.

[221] *Id.* at 3; *see also* JX 346 (email from Murphy relaying assurance he received that TerraForm "is committed to complet[ing] our transaction"); JX 347 (announcement of TerraForm ratings downgrade); Lerdal Tr. 271 (testifying there had been "some [market] deterioration during that six months" and "TerraForm was in trouble").

[222] *See* JX 325-27 (communications with CDPQ discussing changes to use of proceeds); Murphy Tr. 637-38.

On September 23, 2015, Invenergy received regulatory approval for the conversion of Leaf's Series B Notes into equity.[223] On September 24, the equity holders entered into an amendment to the LLC Agreement that admitted Leaf as a member of Invenergy.[224] Other than revising the membership schedules, the LLC Agreement did not change.[225]

Afterwards, Condo told Russell that because Leaf was not an equity holder when Invenergy executed the TerraForm Agreement, Leaf could not assert any rights under the LLC Agreement.[226] The attorneys agreed to disagree on that point.[227]

At the end of September 2015, Leaf's parent company issued its annual report. The "Chairman's Statement" included an update on the Invenergy investment which stated:

> Under the terms of the Operating Agreement, Leaf believes that Invenergy is required to obtain Leaf's consent to the Proposed TerraForm Sale prior to its consummation and that, absent such consent, Invenergy is required to make a payment to Leaf upon the closing of the sale.[228]

---

[223] *See* JX 330 (FERC approval); JX 331 (email transmitting FERC approval from Invenergy to Leaf).

[224] PTO ¶ II.D.5; JX 332.

[225] JX 333 (email from Condo circulating revised agreement and advising "there are no changes to the operating agreement other than the annexes now reflecting Leaf's ownership").

[226] JX 334 (email from Condo relaying conversation to Murphy: "They think they get TM at [the TerraForm] close. I said no, we don't agree with that."); Alemu Tr. 115-16; Condo Tr. 468; Russell Tr. 528-30.

[227] JX 334; Condo Tr. 430; Russell Tr. 530.

[228] JX 337 at 2.

55

Internally, Leaf had no interest in blocking the TerraForm Transaction. Leaf instead worried that pushing its consent right might give TerraForm grounds to back out of the deal.[229] Lerdal decided against filing a lawsuit before closing because "[w]e don't want to give [TerraForm] any excuse to walk."[230] At trial, Lerdal testified candidly that the sale "was a great deal for us."[231] He thought that either Leaf would get its Target Multiple or, "worst case," the parties would end up in the put-call process and "the valuation of Invenergy has just gone through the roof because of this deal."[232] Lerdal also believed that Leaf could not obtain an injunction because a court would hold that Leaf could receive money damages as a remedy.[233]

Alemu sent the Chairman's Statement from Leaf's annual report to Invenergy. On October 9, 2015, he emailed Murphy a "reminder that, pursuant to Section 8.01(e) of the LLC Agreement, Invenergy is required to 'provide each Member with not less than thirty

---

[229] *See* JX 339 at 1 (email from Dean Partners to Lerdal expressing concern that "our lack of consent [could] give [TerraForm] grounds to back out of a market top deal").

[230] JX 340 at 1; *accord* JX 344 (email from Lerdal to Leaf CFO: "Remember the reason we are not filing [suit] prior to closing is to give [TerraForm] no reason to back out. Might be remote, but damages are unchanged before or after closing—if it closes. That is the most important fact for us."); Lerdal Tr. 324 (confirming that Leaf delayed filing a complaint because it "didn't want to give TerraForm any excuse to walk").

[231] Lerdal Tr. 270.

[232] *Id.*

[233] *Id.*; *see also id.* at 349 (reiterating analysis of why Leaf would not have successfully secured an injunction); Condo Tr. 430 (confirming Leaf did not seek to block TerraForm Transaction).

(30) days' prior notice of the occurrence of any Material Partial Sale'" and that "the LLC Agreement requires that Invenergy obtain Leaf's consent prior to participating in or permitting a Material Partial Sale or in lieu of such consent, pay Leaf the Target Multiple."[234]

Invenergy had its outside counsel respond to Alemu's email. The response acknowledged that "[u]nder the terms of the Operating Agreement, the Transaction is a Material Partial Sale."[235] But it took the position that "Leaf did not become a Member until nearly three months after the Company entered into the Transaction."[236]

## P. The TerraForm Transaction Closes.

Between the signing of the TerraForm Agreement and December 2015, Invenergy removed a handful of projects from the sale. On December 15, 2015, the parties entered into an amended and restated TerraForm Agreement and closed the deal.[237] In the revised TerraForm Transaction, Invenergy sold fewer assets and received approximately $1 billion in cash.[238] The revised deal required updated consents from CDPQ and Liberty as well as

---

[234] JX 338 at 1.

[235] JX 341 at 1; *see also* Alemu Tr. 119-20.

[236] JX 341 at 1.

[237] PTO ¶¶ II.D.6-7; JX 355-57 (fully executed Amended and Restated Purchase and Sale Agreement).

[238] JX 495 ¶ 7 (Murphy affidavit).

a revised use-of-proceeds schedule.[239] After all outlays, the TerraForm Transaction left Invenergy with approximately $85 million in working capital.[240]

## Q.    This Litigation And The Put-Call Process

Leaf filed this lawsuit on December 21, 2015.[241] On December 28, 2015, Invenergy exercised its Call Right and proposed a price of $42,375,694.00 for Leaf's entire 2.3% stake.[242] The proposed price implied a total enterprise value for Invenergy of approximately $1.8 billion. Including assumption of debt, the TerraForm Transaction had provided consideration of roughly $2 billion for what Invenergy contended represented just 12.5% of its assets.

Later on December 28, 2015, Leaf exercised its Put Right.[243] Under the LLC Agreement, Invenergy could revoke its call, and Leaf wanted to eliminate that possibility by invoking its put.[244] Leaf proposed a price of $214 million, which it derived by using the value of the TerraForm Transaction to imply a value for Invenergy as a whole.[245]

---

[239] JX 348 at 1 (revised schedule).

[240] *Id.*

[241] PTO ¶ II.E.1; JX 365 (filed complaint); Alemu Tr. 124.

[242] JX 367 at 1 (Invenergy's exercise notice).

[243] JX 368 at 1 (Leaf's exercise notice).

[244] *Id.*; Alemu Tr. 134-35.

[245] Alemu Tr. 134-36, 207; Lerdal Tr. 332-33.

The LLC Agreement obligated the parties to negotiate in good faith in an effort to agree on Fair Market Value. They agreed to meet in Chicago on January 8, 2016.[246] Ahead of the meeting, Alemu sent the calculations underlying Leaf's valuation.[247] During the meeting, Leaf continued to argue in favor of valuing Invenergy based on the TerraForm Transaction. Invenergy argued for valuing Leaf's interest based on CDPQ's investment in 2014.[248] The parties could not reach agreement.

The next step under the Put-Call Provisions was for the parties to hire independent appraisers. Russell and Condo exchanged lists of appraisers that they believed would not qualify as independent.[249] Invenergy engaged Navigant Consulting, Inc., and Leaf engaged XMS Capital Partners, LLC.[250] Neither appeared on either list of problematic appraisers. Nevertheless, each side raised objections to the other side's appraiser and reserved all rights to challenge the selection later. Invenergy expressed concern about whether "XMS has the necessary qualifications to perform an appraisal of a power generation company, as well

---

[246] JX 371 (email exchange arranging meeting); JX 374 (same).

[247] JX 374 at 4.

[248] *See id.*; JX 376 (slides used at meeting).

[249] JX 378 at 3-4.

[250] *Id.* at 1; *see also* JX 381 (negotiating non-disclosure agreement with Navigant); JX 382 (transmitting fully executed XMS engagement letter); JX 384 (transmitting fully executed XMS documents to Invenergy).

59

as its independence."[251] Leaf expressed concern about "Navigant's ability to provide a proper valuation, given that they are primarily a consulting firm."[252]

Both appraisers received a briefing from their clients about the valuation standard and key valuation considerations.[253] Both appraisers understood the nature of the appraisal process, the interests of their client, and the competing interests of the other side.[254] Both appraisers conducted due diligence.[255]

---

[251] JX 378 at 1.

[252] JX 384 at 3.

[253] *See* JX 383 (discussion materials Dean Partners prepared for XMS); JX 397 (notes of Invenergy's meeting with Navigant).

[254] *See, e.g.,* JX 397 at 2 (notes from Invenergy meeting with Navigant containing observation that "Leaf's value will be very high and will skew the value so our value should take that into consideration"); JX 399 (internal Navigant email expressing concern that "[t]he WACC is clearly too low" and exploring ways to "get it up slightly" such as "pull[ing] betas from Bloomberg" which "sometimes . . . are a bit higher"); JX 405 (Navigant email noting that Leaf was relying on the TerraForm Transaction while Invenergy was relying on the 2014 investment by CDPQ and guessing based on the latter that "our target is in that range."); *see also* Kohan Tr. 747-48 (Navigant appraiser testifying that Invenergy had made clear that the TerraForm Transaction represented its "most valuable assets" that "were acquired during a peak in the market"); Nygaard Dep. 70, 73-74 (testimony of XMS representative about discussions with Leaf, including that "the TerraForm transaction and the implied discount rates that were assumed in that transaction would be very important benchmarks").

[255] *See* JX 385; JX 390; JX 396-97; JX 400.

Both Navigant[256] and XMS[257] delivered near final versions of their reports to their clients, discussed the reports with their clients, and made changes in the reports as a result of those discussions that benefited their clients. Both appraisers delivered the revised versions of their reports to their respective clients. Navigant finalized its report after receiving signoff from Invenergy.[258] Leaf and Dean Partners had another round of comments for XMS.[259] In response, XMS made additional changes to its report and presented its final valuation conclusion as a point estimate that slightly exceeded XMS's earlier range.[260] Lerdal admitted that he had "no reason to believe that but for Leaf's cajoling and bird-dogging, XMS would ever have gotten above the top of its prior range."[261]

---

[256] *Compare* JX 436 at 1, 3 (near-final Navigant report ascribing value to Invenergy of approximately $1.93 billion), *with* JX 445 at 1, 6 (updated report ascribing value to Invenergy of $1.583 billion), *and* JX 448 at 3 (final report ascribing value to Invenergy of $1.608 billion). In between, Navigant received feedback from Invenergy. *See, e.g.*, JX 444 (comments from Invenergy team)

[257] *Compare* JX 417 at 1 (initial XMS report valuing Leaf's interest between $45.7 and $56.7 million), *with* JX 439 (revised XMS report valuing Leaf's interest between $57.8 and $71.1 million). In between, XMS received feedback from Leaf and Dean Partners. *See, e.g.*, Lerdal Tr. 336; Alemu Dep. 242-52, 256-62; Dean Dep. 155-61.

[258] *See* JX 445 at 1; JX 449 at 1; JX 451 at 1.

[259] *See* JX 452 (email from Lerdal to Alemu).

[260] *See* JX 460 at 19.

[261] Lerdal Tr. 337. On this point, as in other aspects of his testimony, Lerdal was honest and forthright. He did not dissemble or try to run from factual points that Invenergy's counsel sought to elicit. As discussed elsewhere in this decision, Invenergy's

On April 29, 2016, Leaf and Invenergy exchanged appraisal reports. The XMS report valued Leaf's interest at $73.1 million.[262] The Navigant report valued Leaf's interest at $36.4 million.[263] Because the two appraisals were more than 20% apart, the LLC Agreement required the parties to appoint a third, independent appraiser. Disputes arose over appointing the third appraiser.

Meanwhile, on April 19, 2016, Leaf moved for partial judgment on the pleadings to obtain a determination that closing the TerraForm Transaction without Leaf's consent constituted a breach the LLC Agreement. In response, Invenergy argued (consistent with its position to that point) that the relevant time for evaluating which investors possessed consent rights was when Invenergy *signed* the TerraForm Agreement, not when the TerraForm Transaction closed.[264] Invenergy defended this interpretation by claiming it needed to know in advance of signing whether it had the requisite consents because the "consequence" of not receiving consent was that certain non-consenting members could "require" that their interest be redeemed:

> Under both sections [8.01(e) and 8.04 of the LLC Agreement], the consequence of not obtaining consent is that, if Invenergy nonetheless elects to enter into an agreement without consent, members may require that cash proceeds of the sale be applied to buying out their membership interests at

witnesses took a different approach, particularly when seeking to characterize contemporaneous emails in unpersuasive ways.

[262] JX 460 at 19.

[263] JX 451 at 12.

[264] JX 469 at 21-30 (Invenergy's brief).

closing. *See* LLC Agreement § 8.01(e) (describing notice and election options), § 8.04 (describing when Series B members may be entitled to the Target Multiple, meaning "an amount, in exchange for its entire Company Interest") (defined at § 1.01, Target Multiple)).[265]

The argument demonstrated that, as of May 2016, Invenergy both believed (as Leaf did) and represented to the court that Leaf could compel payment of the Target Multiple in exchange for its interests if Invenergy engaged in a Material Partial Sale without Leaf's consent.

I entered an order granting Leaf's motion in part (the "Liability Order").[266] The Liability Order held that the operative time for determining Leaf's status as a member was at closing. The Liability Order further determined that if this conclusion was incorrect and the operative time was signing, then Leaf had become an equity holder before the signing of the definitive agreement. This was because TerraForm and Invenergy had executed the amended and restated agreement just before closing, well after Invenergy recognized Leaf as a member.[267] The Liability Order found that by not securing Leaf's consent or paying the Target Multiple, Invenergy breached the LLC Agreement.[268] The Liability Order did "not determine the amount of damages," which would "require further proceedings."[269]

---

[265] *Id.* at 24-25.

[266] Dkt. 39.

[267] Dkt. 39 ¶¶ 14-17.

[268] Dkt. 39 ¶¶ 12, 18.

[269] Dkt. 39 ¶ 23.

After the issuance of the Liability Order, Condo was "presented with a proposed separation agreement."[270] The agreement included cooperation and non-disparagement obligations for Condo and provided that he would forfeit any remaining severance payments if he violated those provisions.[271] Condo agreed to release all claims he possessed against Invenergy, but Invenergy did not give Condo a reciprocal release.[272] Invenergy retained new litigation counsel.[273]

Leaf moved for entry of an order and final judgment based on the Target Multiple calculations in the LLC Agreement.[274] Leaf determined that the amount of the Target Multiple was $126,110,576. Invenergy disputed one aspect of Leaf's calculation, but I held that Leaf had calculated the figure correctly.[275]

Invenergy's new counsel argued that even accepting that Invenergy had breached, Leaf was not entitled to its Target Multiple.[276] Invenergy's new counsel argued that determining damages required a trial to consider what the extrinsic evidence showed about

---

[270] Condo Tr. 419; *see also* JX 4.

[271] Condo Tr. 419, 434-35.

[272] *Id.* 433-34.

[273] Dkt. 48.

[274] Dkt. 45.

[275] Dkt. 81 ¶ 6.

[276] Dkt. 62 (Invenergy's answering brief).

the parties' understanding of Leaf's consent right.[277] By order dated October 7, 2016, I denied Leaf's motion to establish the remedy as a matter of law and reiterated that determining the proper remedy required a trial.[278]

On November 1, 2016, Invenergy filed counterclaims relating to the put-call process.[279] The parties mooted part of the counterclaims by agreeing to appoint Moelis & Company, LLC as the third appraiser. Invenergy continued to seek a declaratory judgment that Leaf's conduct during the put-call process violated the express terms of the Put-Call Provisions and breached the implied covenant of good faith and fair dealing.

On April 7, 2017, Moelis delivered an appraisal report valuing Leaf's position at $42.5 million.[280]

## II.    LEGAL ANALYSIS

As a remedy for Invenergy's breach of the Series B Consent Right, Leaf seeks to recover its Target Multiple. Leaf proved at trial that until midway through this litigation, the parties believed that Leaf would receive its Target Multiple in exchange for its entire equity interest if Invenergy engaged in a Material Partial Sale without obtaining Leaf's consent. But that is not the damages remedy afforded to Leaf by Delaware law.

---

[277] Dkt. 83 at 40 (argument transcript).

[278] Dkt. 81.

[279] Dkt. 84.

[280] JX 512 at 32.

To recover damages, Leaf must show that it suffered actual harm from the violation of the Series B Consent Right, meaning that Leaf must be worse off now than if the Material Partial Sale had not taken place. Leaf failed to prove that it suffered actual damages in this sense. Instead, Lerdal admitted that Leaf "ironically" was better off because the TerraForm Transaction took place.[281]

Alternatively, Leaf could show that it could have secured consideration if given the opportunity to negotiate for its consent. While serving as Chancellor, Chief Justice Strine applied this measure of damages in *Fletcher International, Ltd. v. ION Geophysical Corp.*[282] On the facts of this case, Leaf failed to prove that it could have extracted any consideration in return for consenting to the TerraForm Transaction. The record instead shows that if Leaf had insisted on a meaningful payment, then the TerraForm Transaction would not have taken place.

Although Leaf failed to prove that it suffered actual harm, Leaf did establish that Invenergy breached the Series B Consent Right. Leaf is therefore entitled to nominal damages of one dollar.

In its counterclaim, Invenergy contends that Leaf breached the express and implied requirements of the Put-Call Provisions. As a remedy, Invenergy contends that the court should order that Fair Market Value be determined without reference to the XMS appraisal.

---

[281] Lerdal Tr. 344.

[282] 2013 WL 6327997 (Del. Ch. Dec. 4, 2013).

Invenergy failed to prove its counterclaim. The parties will complete the buyout of Leaf's interests in accordance with the LLC Agreement.

## A. Leaf's Entitlement To Damages

In the Liability Order, this court determined that Invenergy breached the Series B Consent Right. At trial, Leaf proved that the parties subjectively believed that Leaf would receive its Target Multiple in exchange for its equity interest if Invenergy engaged in a Material Partial Sale without Leaf's consent. On the facts presented, however, Delaware law will not endorse that remedy. Leaf is therefore entitled only to nominal damages.

### 1. The Parties' Subjective Expectations

Leaf proved at trial that until midway through this case, all of the parties to the LLC Agreement understood that Leaf would receive its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent. Invenergy only advanced a new interpretation after losing the motion for judgment on the pleadings that resulted in the Liability Order, separating from its former General Counsel (Condo), and hiring new litigation counsel. The contemporaneous evidence presented at trial—spanning a period of more than seven years starting with Leaf's investment in 2008—demonstrated the parties'

shared, pre-litigation understanding. The totality of the evidence easily met the preponderance of the evidence standard.[283] It my view, it was clear and convincing.[284]

The most telling evidence of the shared understanding was generated during the negotiations in 2014 over the equity investment by CDPQ and the conversion of a portion of Liberty's debt position into equity. As part of those discussions, Invenergy prepared a matrix that it provided to CDPQ, Liberty, and Leaf which described Leaf's rights in the event of a Material Partial Sale: "Consent required unless paying MPS amount. Leaf MPS amount is Target Multiple."[285] While seeking Leaf's consent for the recapitalization, Condo told Russell that the Series B Consent Right was "a firm consent right that we can't do a C of C absent Leaf's consent if the Target Multiple is not reach[ed]. *So unless they consent not to receive it, they will always get it*."[286] At trial, Condo acknowledged that his

<hr>

[283] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[284] "The clear and convincing evidence standard requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable." *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (internal quotation marks omitted) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)). "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt." *Id.* (internal quotation marks omitted) (quoting Del. Super. P.J.I. § 4.3 (2000)).

[285] JX 112 at 2.

[286] JX 128 at 2 (emphasis added).

reference to "C of C" encompassed a Material Partial Sale.[287] Condo later reassured Russell again, writing that in the event of a Material Partial Sale without consent, "[t]he intent is that Leaf receives its TM."[288]

Leaf then asked for additional upside protection such that if the Material Partial Sale generated distributions which on a pro rata basis would exceed the Target Multiple, Leaf would get the higher amount. Condo relayed the ask to Murphy, Invenergy's CFO, who was the business principal on the deal. Murphy cut to the chase by laying out his understanding of the arrangement:

> My understanding is:
>
> - If we do a material partial sale with their consent, we do the deal and if we have a distribution as a result we pay pro rata.
>
> - If we try to do an MPS and they don't consent, then we can transact anyway as long as we pay them the TM at which point they are out. Probably in this case we pay them more than their pro rata amount to get them to TM.
>
> That was the deal. No way we agree to modify.[289]

Condo agreed and told Murphy, "Your understanding is right."[290]

---

[287] Condo Tr. 440.

[288] JX 128 at 1.

[289] JX 127 at 1.

[290] JX 133 at 1.

69

After that, Murphy spoke with Leaf's business principal, Alemu. After quoting the language of Section 8.04(b), Murphy stated:

To summarize,

- If we do a material partial sale with your consent, the value is captured by the Company to the pro rata benefit of the members. And if we have a distribution as a result the value is pro rata.

- If we desire to do an MPS without your consent, then we can transact anyway as long as we pay you your Target Multiple, at which point you would no longer be a member.[291]

Murphy then moved on to the new point Leaf had raised and explained why it was contrary to the original deal and made little economic sense. Alemu reviewed Murphy's email, agreed with his analysis, and told Murphy that Leaf was "fine with the language below (target multiple for MPS without consent)."[292] Russell fairly summarized the import of these exchanges at trial: "I think it was confirmed . . . by both . . . the GC and the CFO.  In my world, that's pretty good, right, when you have the principals basically saying, 'Yes. This is what the deal is.'"[293]

After Leaf converted to equity, Invenergy's actions evidenced that it continued to have the same understanding. When Leaf asserted that the closing of the TerraForm Transaction would give it a right to its Target Multiple, Invenergy never disputed that this

---

[291] JX 135 at 1.

[292] JX 141 at 1.

[293] Russell Tr. 503.

was the correct result if Leaf had properly converted into equity. Instead, Invenergy argued that it had not breached the Series B Consent Right in the LLC Agreement because Leaf converted into equity after Invenergy signed the TerraForm Agreement.[294] When Leaf filed suit, Invenergy advanced the same reasoning. In its brief opposing Leaf's motion for judgment on the pleadings, Invenergy contended that its interpretation of the point in time for measuring what consents a Material Partial Sale required had to be correct. This was because Invenergy needed to know at signing whether it had to pay out the Target Multiple at closing:

> Under both sections [8.01(e) and 8.04 of the LLC Agreement], the consequence of not obtaining consent is that, if Invenergy nonetheless elects to enter into an agreement without consent, members *may require* that cash proceeds of the sale be applied to buying out their membership interests at closing. *See* LLC Agreement § 8.01(e) (describing notice and election options), *§ 8.04 (describing when Series B members may be entitled to the Target Multiple, meaning "an amount, in exchange for its entire Company Interest")* (defined at § 1.01, Target Multiple)).[295]

Thus, as late as May 2016, Invenergy continued to manifest its belief that Leaf could compel payment of the Target Multiple in exchange for its interests if Invenergy engaged in a Material Partial Sale without Leaf's consent. Invenergy only came up with new arguments after the Liability Order rejected its timing argument.

---

[294] JX 341 at 1.

[295] JX 469 at 24-25 (emphasis added).

71

At trial, Murphy tried to discount his exchanges with Condo and Alemu during the CDPQ negotiations as an "academic exercise" because "there would need to be enough proceeds so that Leaf's pro rata share would be enough to pay them the target multiple" and "their share of the fair market value was very unlikely to exceed the material partial sale amount."[296] I did not find Murphy's testimony on this point credible. The contemporaneous emails do not read like an academic exercise. They read like someone who is stating accurately, definitively, and in straightforward terms what would happen if Invenergy engaged in a Material Partial Sale without Leaf's consent. Both Murphy and Condo agreed at trial that throughout their communications with Leaf, they never suggested that (i) Invenergy had the option—rather than an obligation—to pay Leaf its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent, (ii) Leaf could receive its Target Multiple only if its pro rata share of the proceeds equaled or exceeded the Target Multiple, or (iii) Leaf could receive its Target Multiple only if Liberty and CDPQ consented to the payment.[297]

The testimony and conduct of the other Invenergy representatives further undermined Murphy's hindsight explanation. Sane reported directly to Murphy during his entire time at Invenergy and worked with Murphy and Condo to prepare the matrix

---

[296] Murphy Tr. 603-04.

[297] Condo Tr. 435-43, 446-49; Murphy Tr. 657-58, 663-64.

summarizing the investors' rights.[298] Sane testified that he never had the understanding that Invenergy could pursue a Material Partial Sale without Leaf's consent and only would have to pay the Target Multiple if the transaction generated sufficient proceeds to make a large enough distribution on a pro rata basis.[299] Sane also did not recall any conversations with Murphy in which Murphy expressed this concept.[300] Condo confirmed that as of his departure from Invenergy in July 2016, two weeks after the issuance of the Liability Order, he could not recall any discussions with anyone at Invenergy reflecting that a transaction had to be large enough to yield Leaf its Target Multiple on a pro rata basis to allow Leaf to collect its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent.[301]

At trial, Murphy and Condo also tried to characterize their communications as simply discussing whether Invenergy would have to pay the Target Multiple to Leaf if Invenergy sought to bypass the Series B Consent Right by achieving a transaction that could generate sufficient proceeds to pay the Target Multiple. During the back-and-forth, Russell did identify the possibility that under the original language, Invenergy might argue

---

[298] *See* Murphy Tr. 665-68; Sane Tr. 723.

[299] Sane Tr. 724-25.

[300] *Id.*

[301] Condo Tr. 456-57.

73

that it only had to receive sufficient proceeds, not pay them out.[302] But having considered the evidence as a whole and having considered the credibility of the witnesses, I believe the record supports the view that parties envisioned only two scenarios: either Invenergy would get Leaf's consent or Invenergy would redeem Leaf's interests for its Target Multiple.

### 2. The Absence of Actual Damages

Although Leaf proved what it sought to establish about the parties' subjective beliefs, Invenergy has explained persuasively that the parties' subjective beliefs about a remedy are not controlling unless they are implemented in a remedial provision in an agreement, such as a liquidated damages clause. Instead, Leaf must show that it suffered actual damages before it can recover anything other than a nominal award. One way Leaf could prove actual damages would be by proving that the TerraForm Transaction itself harmed Leaf's interests. Another way that Leaf could prove actual damages would be by proving that if Invenergy had respected the Series B Consent Right, then Leaf could have bargained for consideration in exchange for granting its consent.

The parties have not cited authority which holds explicitly that the parties' subjective beliefs about the likely remedy are not controlling unless memorialized in a remedial provision, but this proposition appears to be correct. The *Restatement (Second) of Contracts* states that the components of expectation damages include

---

[302] *See* JX 128 at 2; Russell Tr. 558-59; *see also* Alemu Tr. 66; Condo Tr. 421, 443, 448.

(a) the loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that [the injured party] has avoided by not having to perform.[303]

These measures do not refer to the parties' subjective beliefs. It thus may be that "[c]ontract damages are ordinarily based on the injured party's expectation interest,"[304] but that concept is a term of art that does not depend on what the parties subjectively expected. Instead, the court determines an amount that will give the injured party "the benefit of its bargain by putting that party in the position it would have been but for the breach."[305] Parties can contract for a specified remedy, such as in a liquidated damages clause,[306] but unless they memorialize their subjective beliefs in such a way, those beliefs do not establish

---

[303] *Restatement (Second) of Contracts* § 347 (Am. Law Inst. 1981).

[304] *Id.* cmt. a.

[305] *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000); *accord Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) ("This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."); *Restatement (Second) of Contracts* § 347 cmt. a ("Contract damages . . . are intended to give [the injured party] the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").

[306] *See generally Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48-50 (Del. 1997).

the measure of damages. Expectancy damages "must be tied to and limited by the express promises made to [the plaintiff] in the Agreement."[307]

In this case, the parties did not memorialize their subjective beliefs about the expected remedy in a contractual provision. As the Liability Order held, the Series B Consent Right did not specify a remedy for breach. After describing how Leaf viewed the appropriate remedy, the Liability Order stated:

> The problem with this analysis is that the Series B Consent Right does not explicitly entitle Leaf to $126 million if its consent to a Material Partial Sale is not obtained. The Payment Path instead establishes a scenario in which the Company does not have to obtain Leaf's consent. The Company did not follow the Payment Path, so that exception does not apply.[308]

Consistent with this ruling, two other decisions by this court—*Ford Holdings* and *GoodCents*—have held that when an investor's consent right contains an exception grounded in the investor's receipt of particular consideration, the exception does not create a right to receive the specified consideration in the event of breach.[309]

As discussed in the prior section, the evidentiary record developed at trial showed that the parties believed subjectively that there were only two possibilities under the Series B Consent Right: Either Leaf would consent, or Leaf would not consent and receive its

---

[307] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 551 (Del. Super.), *aff'd*, 886 A.2d 1278 (Del. 2005) (TABLE).

[308] Dkt. 81 ¶ 7.

[309] *See In re Appraisal of GoodCents Hldgs., Inc.*, 2017 WL 2463665, at *5 (Del. Ch. June 7, 2017); *In re Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 978-79 (Del. Ch. 1997) (Allen, C.).

Target Multiple. Their expectation regarding Leaf's receipt of its Target Multiple stemmed from the exception to the Series B Consent Right and the misimpression that it created a right to receive the Target Multiple in the event of breach. If that misunderstanding were now enforced under the guise of the parties' subjective expectation regarding damages, it would upend this court's holdings in *Ford Holdings* and *GoodCents* and turn the exception into a payment right.

Properly understood, the exception was only an exception. The Series B Consent Right explicitly gave Invenergy only two options to consummate a Material Partial Sale: get Leaf's consent or satisfy the exception by paying Leaf its Target Multiple. But Delaware law recognizes a third option: efficient breach.[310] The doctrine of efficient breach holds that "properly calculated expectation damages increase economic efficiency by giving 'the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach.'"[311] Although Invenergy did not do so consciously at the time, it elected that third option. The result is that Leaf must demonstrate actual damages by showing either that it suffered harm as a result of the TerraForm Transaction or that it

---

[310] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 n.39 (Del. 2013).

[311] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996) (quoting *Restatement (Second) of Contracts*, Reporter's Note to Introductory Note to ch. 16, Remedies).

would have secured additional consideration given the opportunity to negotiate for its consent.

Leaf did not assert that the TerraForm Transaction harmed its interests. Leaf benefitted from the transaction as an investor in Invenergy, because Invenergy sold assets at an attractive price.[312] Lerdal was candid about this in his testimony,[313] and his contemporaneous actions and communications support it.[314] Lerdal admitted that any steps he might have taken to withhold Leaf's consent would not have been to protect Leaf from an economic downside or threatened harm. Rather, any such steps would have been to extract value, or as he put it, to act as "leverage to ask for something in return."[315] Under *Fletcher*, there is a strong argument that this concession should end the matter. Chief Justice Strine observed in that decision that a consent right does not give its holder the "opportunity to coerce value" from a counterparty "in circumstances where [the holder of the consent right] believed that the transaction it was being asked to consent to was highly beneficial."[316] That reasoning indicates that Leaf should not have withheld its consent from the TerraForm Transaction and cannot now recover damages for breach.

---

[312] *See* Alemu Tr. 122-23; Lerdal Tr. 270.

[313] *See, e.g.*, Lerdal Tr. 270, 340-41, 344.

[314] JX 340 at 1; *see also* Lerdal Tr. 270, 349 (confirming Leaf declined to move to enjoin the TerraForm Transaction).

[315] Lerdal Tr. 322-23.

[316] *Fletcher*, 2013 WL 6327997, at *18.

In *Fletcher*, however, Chief Justice Strine did not end his analysis with a finding that the transaction in that case benefitted the issuer by preventing it from becoming insolvent, which would have wiped out the interests of the investor holding the consent right. Instead, he recognized that the investor could have bargained for consideration in return for providing its consent, and he derived a damages award by constructing a hypothetical negotiation among the parties to the transaction. Leaf's remaining avenue for demonstrating actual damages, therefore, is showing it could have negotiated for consideration for waiving its consent given the opportunity.

On the facts of this case, I find that Leaf would not have been able to extract any payment in return for its consent, meaning that Leaf did not suffer any damages from Invenergy bypassing its Series B Consent Right. As part of any negotiation with Leaf over the Series B Consent Right, Invenergy had at least three options: (i) pay Leaf some amount as the price of going forward with the TerraForm Transaction; (ii) restructure the TerraForm Transaction to reduce its value below the threshold for a Material Partial Sale, or (iii) abandon the TerraForm Transaction entirely.[317] Importantly, Invenergy would be

---

[317] Invenergy has suggested that it might have bargained with TerraForm for the ability to hold open the TerraForm Transaction until after December 22, 2015, when Invenergy could exercise the Call Right. Leaf also worried that Invenergy might pursue that strategy. *See, e.g.*, JX 223 at 1; JX 249 at 8; Lerdal Tr. 307; Lerdal Dep. 106. As a factual matter, it may have been true that Invenergy could have pushed out the closing. Invenergy certainly had the ability to seek a drop-dead date for the TerraForm Transaction of December 23, 2015, or later, rather than the original drop-dead date of December 15, and that would have enabled Invenergy to exercise the Call Right before closing. After August 2015, market conditions made it unlikely that TerraForm would have agreed to an extension beyond the original drop-dead, but before that point (and particularly during the

evaluating these options under circumstances where it had no pressing need for the proceeds from the TerraForm Transaction.[318] Invenergy liked the price TerraForm was offering and could put the money to good use paying down debt, but Invenergy also had the flexibility to pass on the deal, particularly if Leaf made aggressive demands.

Given its various options and lack of any financial pressure, Invenergy would have had considerable leverage in any negotiation. By contrast, Leaf would have been bluffing about its willingness to block the deal. In spring 2014, Leaf's parent company had started liquidating its investments.[319] Leaf intended to exercise its Put Right in December no matter what.[320] Leaf recognized that the TerraForm Transaction was beneficial for the valuation

---

original negotiations), there is no reason to think that Invenergy could not have obtained an additional ten days or so. Nevertheless, as a legal matter, that strategy would not have been effective. The LLC Agreement provided that an equity holder would retain all of its rights until the close of the call exercise. *See* JX 180 § 11(g). The closing of the call exercise would occur on the thirtieth day after the parties determined Fair Market Value. *See id.* Given the elaborate process for determining fair value and the tension between the parties, the call exercise likely would not have closed for months after Invenergy exercised its Call Right. If the Terraform Transaction closed during this extended period, as it almost certainly would have, then the closing could have breached the Series B Consent Right, and the parties would have been in the same positon where they are today. For Invenergy, pushing back the drop-dead date and exercising the Call Right was not a viable strategy for avoiding breach.

[318] Renault Tr. 390 (confirming Invenergy had "[p]lenty" of "avenues to raise short-term cash if it needed short-term cash"); Murphy Tr. 617 (confirming Invenergy did not "need to sell assets in 2015"); Polsky Dep. 106-07 (denying "this was a necessary transaction").

[319] JX 155 at 5 (Leaf's parent's annual report announcing it was initiating "the orderly realisation of [its] investments and the return of capital to the shareholders.").

[320] *See, e.g.*, JX 172; JX 173 at 1; JX 249 at 9; *see also* JX 280 at 6.

process, because Leaf could use metrics derived from it to calculate a high valuation for Invenergy as a whole.[321] Consequently, Leaf had no intention of delaying or jeopardizing the TerraForm Transaction.[322] Leaf even decided to delay filing suit until after the TerraForm Transaction closed because "[w]e don't want to give [TerraForm] any excuse to walk."[323]

Moreover, Leaf's consent was not the only investor sign-off the TerraForm Transaction required to close. CDPQ and Liberty also had to consent, and there is no reason to believe that they would have authorized a transaction that distributed value to Leaf

---

[321] JX 189 (email from Alemu to Lerdal describing TerraForm Transaction as "a really good precedent for our process since we can exercise the put by the end of the year" and can "use [the TerraForm Transaction] as a proxy for the remainder of the pipeline and then try to use cost of equity of yieldco's to value operational projects"); *accord* JX 223 at 1; *see also* JX 337 at 2 (Leaf's Chairman's Statement alleviating concern around the TerraForm Transaction closing because "Leaf's conversion to equity provides an additional pathway for Leaf to sell its equity interest to Invenergy"); Lerdal Tr. 270 ("I'm going to get this target multiple or, worst case, the valuation of Invenergy has just gone through the roof because of this deal."); *id.* at 305-07 (testifying he wanted the deal to close because Invenergy was "doing a very good deal for not themselves but for everyone" and was selling "[i]f not at the very top [of the market], very close" which would "give Leaf a better return under the appraisal process, either the put or the call"); *id.* at 344 (agreeing he is "better off today with an appraisal and a fair market value with a TerraForm transaction than [he] would be if the negotiations resulted in a stalemate, because there, [he would] be in an appraisal world at a lower price").

[322] *See* JX 339 at 1; JX 344 (email from Lerdal to Leaf CFO: "Remember the reason we are not filing prior to closing is to give [TerraForm] no reason to back out. Might be remote, but damages are unchanged before or after closing—if it closes. That is the most important fact for us."); Lerdal Tr. 324 (confirming that Leaf delayed filing a complaint because it "didn't want to give TerraForm any excuse to walk"); *see also id.* at 270, 349.

[323] JX 340 at 1.

81

preferentially. Together, CDPQ and Liberty owned over 40% of Invenergy's equity; Leaf owned a 2.3% interest.[324] Representatives of CDPQ and Liberty testified that they would not have consented to preferential distributions to Leaf.[325] I have viewed this testimony skeptically because at this point, a damages award in favor of Leaf would harm CDPQ and Liberty indirectly. I nevertheless credit their testimony that they would not have consented.

Invenergy's negotiations with CDPQ and Liberty to secure their consents to the TerraForm Transaction support a finding that viewed any distribution to the equity holders was a nonstarter. When Invenergy first sought consent from CDPQ and Liberty, they asked that Invenergy distribute part of the proceeds to them.[326] Invenergy refused, and the investors backed down. Then, at the eleventh hour, Liberty asked to receive a prepayment penalty in the amount of $2 million for redeeming its Series A Notes with the proceeds. Invenergy rejected the request as "insane,"[327] and Liberty again backed down.[328]

The consent that CDPQ and Liberty ultimately signed did not provide for distributions to the investors. The only portion of the proceeds that went to CDPQ was

---

[324] PTO ¶ II.C.5 n.3.

[325] *See* Renault Tr. 389; Fontanes Tr. 777-79.

[326] JX 201 at 1; *accord* Murphy Tr. 632-33, 639-41.

[327] JX 264.

[328] *See* Murphy Tr. 639.

necessary to remove a security interest that CDPQ had in certain of the assets being sold.[329] The only portion of the proceeds that went to Liberty was used to repay its position in the Series A Notes.[330] Invenergy retained all of the proceeds net of expenses necessary to consummate the TerraForm Transaction or repay existing debt.

In my view, Leaf would have come to the negotiations eager to maximize its returns and full of bluster. Lerdal testified that he would not have accepted less than $100 million in return for Leaf's consent.[331] He might have taken that position at first, but he would have learned quickly that on those terms the TerraForm Transaction would not have happened. Once Lerdal found himself in a multi-party negotiation with CDPQ, Liberty, and Invenergy, and once it became clear that CDPQ and Liberty were not getting any distributions, Lerdal would have realized that he did not have the leverage he thought he had. The evidence shows that Leaf had no desire to jeopardize the TerraForm Transaction. Instead, Leaf wanted to gain from the resulting increase in Invenergy's valuation when it exercised its Put Option. In my view, in a hypothetical negotiation, Leaf ultimately would have consented without receiving any unique consideration.

---

[329] *See* Renault Tr. 382-88.

[330] *See* JX 348 at 1; Murphy Tr. 634-38.

[331] Lerdal Tr. 340-41.

### 3. Nominal Damages

Leaf suffered no actual damages due to Invenergy's breach of the Series B Consent Right. The TerraForm Transaction did not harm Leaf, and Leaf could not have secured any additional consideration at the bargaining table. But "[e]ven if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."[332] "'Nominal' damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff."[333] They "are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong."[334] This decision awards one dollar to Leaf as nominal damages for Invenergy's breach.

### B. Invenergy's Claim For Breach Of The Put-Call Provisions

Invenergy seeks a declaratory judgment that Leaf breached the Put-Call Provisions by making an aggressive opening demand for the exercise price, then later by trying to convince XMS to raise its valuation. As the party asserting this claim, Invenergy had the

---

[332] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009).

[333] *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) (quoting *USH Ventures v. Glob. Telesystems Gp., Inc.*, 796 A.2d 7, 23 (Del. Super. 2000)).

[334] *Id.* (quoting *USH Ventures*, 796 A.2d at 23).

burden of proving it by a preponderance of the evidence.[335] Invenergy did not meet its

burden.

### 1. Leaf's Opening Bid

Invenergy contends that Leaf breached the explicit terms of the Put-Call Provisions

that require the parties to "negotiate in good faith" to determine the price at which

Invenergy would purchase Leaf's interests.[336] "[A]n express contractual obligation to

negotiate in good faith is binding on the contracting parties."[337] "At the very least," an

obligation to negotiate in good faith precludes either party from "insist[ing] on specific

terms that directly contradict[] a specific provision found in" the instrument creating the

good-faith obligation.[338] "Under Delaware law, 'bad faith is not simply bad judgment or

negligence, but rather it implies the conscious doing of a wrong because of dishonest

---

[335] *See* 26 C.J.S. *Declaratory Judgments* § 157 (2017); *see also San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch. 2009) ("Because Amylin seeks a declaratory judgment as to its right to approve, it bears the burden of proof here."); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 739 (Del. Ch. 2008) ("[T]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward." (internal quotation marks omitted) (quoting *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 4554453, at *6 (Del. Ch. Dec. 21, 2007), *aff'd*, 962 A.2d 916 (Del. 2008) (TABLE)).

[336] JX 332 § 11.09(a), (d).

[337] *SIGA Techs., Inc. v. PharmaAthene, Inc.*, 67 A.3d 330, 343-44 (Del. 2013).

[338] *RGC Int'l Inv'rs, LDC v. Greka Energy Corp.*, 2001 WL 984689, at *14 (Del. Ch. Aug. 22, 2001) (Strine, V.C.), *rev'd on other grounds*, *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013); *see also SIGA Techs.*, 67 A.3d at 344 (quoting *RGC* with approval).

purpose or moral obliquity.'"[339] Bad faith "is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."[340]

Invenergy relies on Leaf's opening bid of $214 million as evidence of bad faith.[341] Compared to where the appraisers ended up, that figure turned out to be quite high: nearly three times the XMS appraisal and five times what Moelis derived.[342] It was also almost twice the value that Leaf placed on its entire portfolio just a few days later.[343] But Leaf had a reasoned basis for making this ask: it relied on the value implied by the TerraForm Transaction, which comprised a portion of Invenergy's assets, and used that figure to calculate Leaf's share. Although aggressive, the $214 million figure was supportable and not outside the realm of reason.

Except for a high opening bid, Invenergy has not identified any other indicia that Leaf negotiated in bad faith. When Invenergy reached out to schedule a meeting to

---

[339] *SIGA Techs.*, 67 A.3d at 346 (quoting *CNL-AB LLC v. E. Prop. Fund I SPE (MS REF) LLC*, 2011 WL 353529, at *9 (Del. Ch. Jan. 28, 2011)).

[340] *Id.* (internal quotation marks omitted) (quoting *CNL-AB*, 2011 WL 353529, at *9).

[341] *See* JX 368 (Leaf's exercise notice); Alemu Tr. 207; Lerdal Tr. 332.

[342] *See* JX 460 at 19 (XMS report); JX 512 at 32 (Moelis report).

[343] JX 389 at 2 (Leaf's December 31, 2015 Interim Report to investors).

negotiate, Leaf acquiesced to Invenergy's request to meet in Chicago.[344] Ahead of that meeting, Alemu sent an explanation of Leaf's opening bid.[345] During the meeting, the parties engaged in negotiations, with each side presenting its positions. When the negotiations were unsuccessful, the parties collaborated on moving forward with the appraisal process.[346]

Leaf's aggressive opening bid is not enough to establish bad faith. Invenergy has failed to carry its burden to prove that Leaf breached the express terms of the Put-Call Provisions by failing to proceed in good faith.

### 2. Leaf's Retention Of And Interactions With XMS

Invenergy next takes issue with Leaf's interactions with XMS. The evidence shows that Leaf sought to convince XMS to reach a higher valuation of Leaf's interest. According to Invenergy, Leaf's efforts resulted in XMS not being an "independent appraiser," as required by the Put-Call Provisions. Invenergy also contends that Leaf breached the implied covenant by pushing XMS. Neither claim succeeds.

### a. The Independence Requirement

The LLC Agreement defines Fair Market Value, in relevant part, as

> the amount that could be obtained from an arm's length willing buyer (not a current employee or Executive Officer) for 100% of the Company Interests. Such price shall be determined by the averaging of the prices obtained from

---

[344] JX 371; JX 374; *see also* JX 373 (Invenergy sending timeline to its attorneys in anticipation of meeting).

[345] JX 374 at 4.

[346] *See* JX 376.

(x) an independent appraiser or investment bank chosen by the Company (following consultation with CDPQ) and (y) an independent appraiser or investment bank chosen by Liberty or the Series B Non-Voting Investor Member, as applicable; <u>provided</u>, that if such appraisal amounts vary by greater than 20% a third appraiser shall be chosen jointly by the parties and the price per share shall be the averaging of the three appraisals. For the sake of clarity, when Fair Market Value is being determined and there is not an active trading market, the appraisers shall value the interests without ascribing a minority interest or illiquidity discount. The Company and Liberty or the Series B Non-Voting Investor Member, as applicable, agree to instruct each independent appraiser or investment bank, as the case may be, to promptly complete all independent appraisals, and that in any event all such independent appraisals shall be completed within sixty (60) days of the date that each independent appraiser is engaged.[347]

In three locations, this provision refers to an "independent appraiser or investment bank."

It then refers twice to the "independent appraisals" and finishes with a final reference to

"such independent appraiser."

When established legal terminology is used in a legal document, a court will

presume that the parties intended to use the established legal meaning of the terms.[348]

Under Delaware law, which governs the LLC Agreement, the concept of "independence"

---

[347] JX 332 § 1.01.

[348] *See Hazout v. Tsang Mun Ting*, 134 A.3d 274, 290 n.58 (Del. 2016) (collecting authorities demonstrating that where the legislature uses a term with a "well-settled legal meaning" it uses the term in its "legal sense"); *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (looking to "both legal and non-legal definitions" of "to make" in interpreting statute of limitations); *cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 2005 WL 5775806, at *11 (Del. Ch. Aug. 22, 2005) (presuming use of words with "no accepted blackletter legal definition . . . was an implicit agreement by the parties to avoid the use of legal terms of art").

refs to the ability to make a decision based on the merits, free of "extraneous considerations or influences."[349]

In this case, the plain language of the Put-Call Provisions required that each side select an appraiser that was independent in the sense of being able to render a valuation on the merits, free of extraneous considerations or influences. Examples of situations that might compromise an appraiser's independence include a pending engagement for the other side of the negotiation or such a thick relationship with either side as to create a feeling of loyalty or owing-ness. Such a degree of connection might arise because of extensive present or past engagements or because of personal ties between the principals of the appraisal firm and its client. The terms of an appraiser's engagement also could compromise the appraiser's independence, such as a fee arrangement that gave the appraiser a pecuniary interest in the outcome of the valuation.[350] These are merely examples; this list is not intended to be exhaustive.

In this case, Invenergy has not pointed to anything that would have compromised XMS's independence. Invenergy has not identified any prior relationship between XMS

[349] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

[350] *See, e.g.*, *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167-68 (Del. 1995) (establishing standard for when financial interest is "material" for purposes of duty of loyalty); *Weinberger v. UOP, Inc.*, 457 A.2d 701,710 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").

and Leaf, any financial interest XMS had in the outcome of the appraisal, or any similar attachment that could create a conflict. Although the LLC Agreement did not require it, the parties conferred regarding their selection of appraisers. As part of that process, Invenergy identified to Leaf twenty-three potential appraisers it deemed conflicted; XMS was not one of them.[351] Although Invenergy later intimated that it harbored doubts as to the "independence" of XMS,[352] it never provided any specifics.

Invenergy instead relies on Leaf's interactions with XMS to argue that XMS was not independent. The record reflects that both parties engaged with their appraisers and made arguments in favor of valuations that would favor their positon. But the record also reflects that both appraisers ultimately exercised independent judgment to reach supportable valuation opinions.[353] Leaf's interactions with XMS were more extensive in degree than Invenergy's interactions with Navigant (or at least there is more evidence documenting them), but they did not differ in kind. In my view, Invenergy failed to establish that Leaf pressured XMS to such a degree that XMS was no longer independent for purposes of the Put-Call Provisions.

---

[351] JX 378 at 5-6.

[352] *Id.* at 1.

[353] *See* Alemu Tr. 144, 147, 150; Lerdal Tr. 333, 350-51; Sane Tr. 742-44; Nygaard Dep. 110, 115, 119, 180-82; *see also id.* at 180; Houlihan Dep. 87, 124.

### b. Breach Of The Implied Covenant

As an alternative to its claim that Leaf breached the express terms of the LLC Agreement, Invenergy argues that Leaf breached the implied covenant of good faith and fair dealing. Although not explicit about it, Invenergy appears to argue that Leaf breached an implied term requiring that Leaf conduct the appraisal in "good faith."[354] To secure a declaration that Leaf breached the implied covenant, Invenergy carries the burden of proving "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[355]

Under Delaware law, the implied covenant of good faith and fair dealing "attaches to every contract."[356] The implied covenant of good faith and fair dealing is a doctrine deployed to ensure that parties' contractual expectations are fulfilled under circumstances

---

[354] *See Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *25-26 (Del. Ch. May 13, 2013) (Strine, C.) (finding that a procedure "which contractually provides for additional appraisals in the event of a dispute . . . does not contemplate any judicial review" but under such circumstances "it is a contractual expectation that the appraiser make a good faith, independent judgment about value to set the contractual input" and therefore any review "would not . . . involve second-guessing the good faith judgment of the appraiser" but rather whether "a party had breached the contract's implied covenant of good faith and fair dealing").

[355] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[356] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-42 (Del. 2005).

that they did not anticipate. In its most common manifestation, the implied covenant "supplies terms to fill gaps in the express provisions of a specific agreement."[357]

Invoking the doctrine is a "cautious enterprise."[358] Implying contract terms is an "occasional necessity . . . to ensure [that] the parties' reasonable expectations are fulfilled."[359] Its use should be "rare and fact-intensive, turning on issues of compelling fairness."[360] To aid in that cautious enterprise, this court has developed a methodical, multi-step process to guide the application of the implied covenant: determination of the existence of a gap, determination of whether the circumstances warrant filling that gap, and, if necessary, crafting of the appropriate term to fill that gap.[361]

Here, Invenergy did not engage in a methodical analysis of the implied covenant. It did not expressly identify the gap it seeks to fill, nor the term it seeks to fill it with. In addition, the parties did not develop the factual record surrounding the negotiating history of the Put-Call Provisions, making it all the more difficult to analyze these questions.

---

[357] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[358] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotation marks omitted) (quoting *Dunlap*, 878 A.2d at 441).

[359] *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted).

[360] *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

[361] *See, e.g.*, *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *58-60; *Allen*, 113 A.3d at 182-85.

Instead, Invenergy has claimed that Leaf breached an implied term to conduct the appraisal in good faith by instructing XMS to determine "Fair Market Value" as the "highest" price that anyone would pay for the company.[362] Citing the Delaware Supreme Court's recent decision in *DFC Global Corp. v. Muirfield Value Partners, L.P.*, Invenergy argues that this definition is directly opposed to Delaware law, which holds that "fair value is just that, 'fair.'  It does not mean the highest possible price that a company might have sold for had Warren Buffet negotiated for it on his best day and the Lenape who sold Manhattan on their worst."[363] The Delaware Supreme Court made those comments when discussing the meaning of "fair value" under the appraisal statute.[364]

This case involves a contractual definition for "Fair Market Value." When Leaf originally invested, the LLC Agreement defined that term as

> the product of (x) *the highest price per unit of equity interest* which the Company could obtain from a willing buyer (not a current employee or director) for the Company's Company Interests in a transaction involving the sale by the Company of all equity interests times (y) the number of Company Interests being valued.[365]

---

[362] *See* Alemu Tr. 219-20; Alemu Dep. 283-84 (recalling that Leaf instructed XMS that Fair Market Value was "the highest amount that could be achieved . . . on an M&A sale."); Nygaard Dep. 70.

[363] 172 A.3d 346, 370 (Del. 2017).

[364] 8 *Del. C.* § 262.

[365] JX 38 at 85 (emphasis added).

The standard further specified that when "there is not an active trading market, the appraisers shall value the interests without ascribing a minority interest or illiquidity discount."[366]

The definition of "Fair Market Value" in the governing LLC Agreement dropped the "highest price" language and defined the measure simply as "the amount that could be obtained from an arm's length willing buyer."[367] Given the history of the provision and the use of the phrase "could be obtained," it was not unreasonable for Leaf to take the position that XMS could derive the highest price that could be obtained from a third party. Under the circumstances of this case, in light of the evolution of the provision, Leaf's position did not breach the implied covenant.

## III.    CONCLUSION

Leaf is awarded nominal damages of one dollar for Invenergy's breach of the Series B Consent Right. Invenergy's request for a declaratory judgment that Leaf breached the express and implied terms of the Put-Call Provisions is denied. In light of this decision, the parties will complete the put-call process in accordance with the governing provisions in the LLC Agreement.

To implement this relief, the parties shall submit a final judgment that is agreed upon as to form. If there are issues that the court needs to address before it can enter a final

---

[366] *Id.*

[367] JX 332 at 12.

judgment, then the parties shall submit a joint letter within sixty days that identifies those issues and proposes a path forward that will bring this case to a conclusion at the trial level.